## INTERNATIONAL PAPER COMPANY *v.* UNITED STATES.

No. 37. Argued January 7, 1931.—Decided January 19, 1931.

*Mr. John W. Davis,* with whom *Messrs. William C. Cannon, Montgomery B. Angell,* and *Porter R. Chandler* were on the brief, for petitioner.

*Mr. Claude R. Branch* argued the cause and *Solicitor General Thacher, Assistant Attorney General Rugg,* and *Messrs. Erwin N. Griswold* and *H. Brian Holland* filed a brief; for the United States.

Mr. JUSTICE HOLMES delivered the opinion of the Court.

This is a proceeding by the petitioner to recover compensation for property rights in water of the Niagara River alleged to have been taken by the United States for war purposes. The Niagara Falls Power Company by private grant to it, Letters Patent from the State of New York and acts of the Legislature of that State, was the owner so far as the law of New York could make it owner of land and water rights on the American side of the River above the Falls. Included in them was a power canal through which the Power Company was authorized

to divert 10,000 cubic feet per second, at the time of the alleged taking. From this canal the petitioner, the International Paper Company, was entitled, by conveyance and lease, to draw and was drawing 730 cubic feet per second,—a right that by the law of New York was a corporeal hereditament and real estate.

On December 28, 1917, the Secretary of War wrote to the Power Company that "The President of the United States by virtue of and pursuant to the authority vested in him, and by reason of the exigencies of the national security and defence, hereby places an order with you for and hereby requisitions the total quantity and output of the electrical power which is capable of being produced and/or delivered by you through the use of all waters diverted or capable of being diverted through your intake canal and/or your plants and machinery connected therewith." Immediate and continuous delivery of such power was directed and it was added "You will be paid fair and just compensation for power delivered hereunder." At the same time an agreement was made by the Secretary of War and the Power Company, (reciting that the President has requisitioned the power as above,) to the effect that the Secretary of War " acting for and in behalf of the United States " until further notice waives delivery of the power to the United States on the express condition that the Power Company shall distribute such power as provided in a schedule naming companies and amounts but not naming the petitioner, and on the other side the Power Company waives all right of compensation by reason of said requisition if permitted to carry on its business and to sell consistently with the exigencies of the national security and defence. On December 29, the representative of the Secretary of War wrote to the secretary of the Power Company " Please note that the requisition order covers also all of the water capable of being diverted through your intake canal. . . . This is intended to cut

off the water being taken by the International Paper Company and thereby increase your productive capacity," and on December 31 telegraphed to the counsel of the petitioner " Power Company has been directed to take water hitherto used by International Paper Co." . The petitioner had been notified of what was to happen but was allowed time to run out its stock on hand. On February 7, 1918, its use of the water ceased and was not resumed until midnight November 30, 1918, when the order of December 28 was abrogated. The Court of Claims found that the shutting off of the water from the petitioner's mill cost it $304,685.36, direct overhead expense, but gave judgment that the petition be dismissed.

The Government has urged different defenses with varying energy at different stages of the case. The latest to be pressed is that it does not appear that the action of the Secretary was authorized by Congress. We shall give scant consideration to such a repudiation of responsibility. The Secretary of War in the name of the President, with the power of the country behind him, in critical time of war, requisitioned what was needed and got it. Nobody doubts, we presume, that if any technical defect of authority had been pointed out it would have been remedied at once. The Government exercised its power in the interest of the country in an important matter, without difficulty, so far as appears, until the time comes to pay for what it has had. The doubt is rather late. We shall accept as sufficient answer the reference of the petitioner to the National Defense Act of June 3, 1916, c. 134, § 120, 39 Stat. 166, 213; U. S. Code, Title 50, § 80, giving the President in time of war power to place an obligatory order with any corporation for such product as may be required, which is of the kind usually produced by such corporation.

Then it is said that there was no taking, but merely a making of arrangements by contract. But all the agreements were on the footing that the Government had made a requisition that the other party was bound to obey. *Liggett & Myers Tobacco Co.* v. *United States,* 274 U. S. 215, 220. It is said that the Power Company and the petitioner could withdraw water from the River only by license from the United States, under the Act of June 29, 1906, c. 3621, 34 Stat. 626, and that the license was revoked by what was done. But the Secretary of War did not attempt to pervert the powers given to him in the interest of navigation and international duties to such an end. He proceeded on the footing of a full recognition of the Power Company's rights and of the Government's duty to pay for the taking that he purported to accomplish. There is no room for quibbling distinctions between the taking of power and the taking of water rights. The petitioner's right was to the use of the water; and when all the water that it used was withdrawn from the petitioner's mill and turned elsewhere by government requisition for the production of power it is hard to see what more the Government could do to take the use. It is true that the petitioner did not come within the scope of the Government's written promise to pay. But the Government purported to be using its power of eminent domain to acquire rights that did not belong to it and for which it was bound by the Constitution to pay. It promised to pay for all the power that the canal could generate. If it failed to realize that the petitioner had a right to a part of the power, its clear general purpose and undertaking was to pay for the rights that it took when it took the power. *Phelps* v. *United States,* 274 U. S. 341, 343. *Campbell* v. *United States,* 266 U. S. 368, 370, 371. *United States* v. *Great*

*Falls Manufacturing Co.,* 112 U. S. 645, 656.   Of course it does not matter that by a subordinate arrangement it directed the use of the power to companies that would fulfil its purposes rather than to machinery of its own. That arrangement it was able to make only because it took the power.

We perceive no difficulty arising from the case of *Omnia Commercial Co.* v. *United States,* 261 U. S. 502.   There the taking of the whole product of a company went no further than to make it practically impossible for that company to keep a collateral contract to deliver a certain amount of steel to the appellant.   But here the Government took the property that the petitioner owned as fully as the Power Company owned the residue of the water power in the canal.   Our conclusion upon the whole matter is that the Government intended to take and did take the use of all the water power in the canal; that it relied upon and exercised its power of eminent domain to that end; that, purporting to act under that power and no other, it promised to pay the owners of that power, and that it did not make the taking any less a taking for public use by its logically subsequent direction that the power should be delivered to private companies for work deemed more useful than the manufacture of paper for the exigencies of the national security and defence.   See *Mt. Vernon-Woodberry Cotton Duck Co.* v. *Alabama Interstate Power Co.,* 240 U. S. 30.

*Judgment reversed.*

Mr. JUSTICE McREYNOLDS, Mr. JUSTICE STONE and Mr. JUSTICE ROBERTS are of opinion that the judgment of the Court of Claims should be affirmed.