**TULARE LAKE BASIN WATER STORAGE DISTRICT, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 98–101 L.**

United States Court of Federal Claims.

April 30, 2001.

Roger J. Marzulla, Nancie G. Marzulla, and Andrew R. Stephens, Marzulla & Marzulla, Washington, D.C., counsel for plaintiffs.*

Deputy Chief James S. Brookshire, General Litigation Section, Environment and Natural Resources Division, Department of Justice, Washington, D.C., for defendant. Sam Rauch, Wildlife Section, Environment and Natural Resources Division, Department of Justice, Washington, D.C., Dana Jacobsen, Office of the Solicitor, Department of Interior, Sacramento, California, and Dawn R. Andrews, Office of General Counsel, National Oceanic and Atmospheric Administration, Department of Commerce, Long Beach, California, of counsel.**

## OPINION

WIESE, Judge.

Plaintiffs are California water users who claim that their contractually-conferred right to the use of water was taken from them when the federal government imposed water use restrictions under the Endangered Species Act. They now seek Fifth Amendment compensation for their alleged loss. The case is before the court on the parties' cross-motions for summary judgment as to liability. The issues have been fully briefed, and oral argument was heard on March 20, 2001. We now rule in favor of plaintiffs, and deny the government's cross-motion for summary judgment.

### FACTS

This case concerns the delta smelt and the winter-run chinook salmon—two species of fish determined by the United States Fish and Wildlife Service ("USFWS") and the National Marine Fisheries Service ("NMFS") to be in jeopardy of extinction. The efforts by those agencies to protect the fish—specifically by restricting water out-flows in California's primary water distribution system—bring together, and arguably into conflict, the Endangered Species Act and California's century-old regime of private water rights. The intersection of those concerns, and the proper balance between them, lie at the heart of this litigation.

The development of California's water system has a long and detailed history well chronicled in case law. *See, e.g., United States v. State Water Resources Control Bd.,* 182 Cal.App.3d 82, 227 Cal.Rptr. 161 (1986). That system, in brief, involves the transport of water from the water-rich areas in northern California to the more arid parts of the state. Various water projects or aqueduct systems have been built to facilitate that goal; two—the Central Valley Project ("CVP") and the State Water Project ("SWP")—are the focus of the present litigation.

Although CVP is a federal project managed by the Bureau of Reclamation ("BOR") and SWP is a state project managed by the Department of Water Resources ("DWR"), the two projects share a coordinated pumping system that requires, as a practical matter, that the systems be operated in concert.

* Briefs of *Amici Curiae* in support of plaintiffs' position were filed for State Water Contractors by *Daniel J. O'Hanlon,* Beveridge & Diamond LLP, San Francisco, California and for Pacific Legal Foundation by *James S. Burling, Robin L. Rivett,* and *David E. Haddock,* Sacramento, California.

** Briefs of *Amici Curiae* in support of defendant's position were filed for the Natural Heritage Institute; National Wildlife Federation; the Sierra Club; Defenders of Wildlife; the Planning and Conservation League; California Trout; and Water Watch of Oregon by *Gregory A. Thomas,* Natural Heritage Institute, San Francisco, California, and *Tara L. Mueller,* Environmental Law Foundation, Oakland, California. Of counsel on the briefs were *Professors Peter Byrne,* Georgetown University Law Center; *Joseph Sax,* University of California at Berkeley, School of Law; *Brian Gray,* Hastings College of the Law; *Harrison P. Dunning,* University of California at Davis, School of Law; *Antonio Rossman,* University of California at Berkeley, School of Law; and *John D. Echeverria,* Environmental Policy Project, Georgetown University Law Center.

That arrangement has been formalized both by statute and by subsequent agreement.[1] In order to operate the two projects, water is diverted from the Feather and Sacramento Rivers, captured by pumping systems located at the southern edge of the Sacramento–San Joaquin Delta, and then distributed, through a series of canals, to end-users in southern California. Water that is not diverted from the Delta flows into the San Francisco Bay.

Both BOR and DWR are granted water permits by the State Water Resources Control Board ("SWRCB" or "the Board")—a state agency with the ultimate authority for controlling, appropriating, using and distributing state waters. *See California v. United States,* 438 U.S. 645, 98 S.Ct. 2985, 57 L.Ed.2d 1018 (1978). BOR and DWR in turn contract with county water districts, conferring on them the right to withdraw or use prescribed quantities of water. Of the present plaintiffs, two—Tulare Lake Basin Water Storage District and Kern County Water Agency—have contracts directly with the State Water Project, and three—Hansen Ranches, Lost Hills Water District, and Wheeler Ridge–Maricopa Water Supply District—have subsidiary contracts with Tulare and Kern County. Under its contract with DWR, Kern County's allotment of entitlement water was set at 1,153,400 acre-feet per year during the period in question (1992–1994), while Tulare's allocation was 118,500 acre-feet.

By law, the water projects are required to be financially self-sustaining, with the costs of construction and maintenance to be paid entirely by those who ultimately receive the water. The water contractors are thus obligated to pay to maintain the operation of the system regardless of the amount of water actually received. Because the amount of water available to water users in a particular year is largely a function of natural causes, however, the permits explicitly provide that the state will not be held liable for shortages due to drought or other causes beyond its control.

Against this backdrop of water transportation and entitlements, Congress passed the Endangered Species Act in 1973. 16 U.S.C. §§ 1531–1544 (1994) ("ESA"). That act was designed to "halt and reverse the trend toward species extinction, whatever the cost." *Tennessee Valley Auth. v. Hill,* 437 U.S. 153, 184, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978). Under the ESA, federal agencies are required to consult with the Secretary of the Interior or Commerce to "insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species ...." 16 U.S.C. § 1536(a)(2) (1994).

In fulfillment of the duties assigned to it under the ESA, the National Marine Fisheries Service initiated discussions with the federal Bureau of Reclamation and state Department of Water Resources to determine the impact of the Central Valley Project and the State Water Project on the winter-run chinook salmon. As a result of those discussions, the NMFS issued a biological opinion on February 14, 1992, concluding that the proposed operation of SWP and CVP was likely to jeopardize the continued existence of the salmon population. Included in the agency's findings was a reasonable and prudent alternative ("RPA")[2] designed to protect the fish by restricting the time and manner of pumping water out of the Delta. As a result, water that would otherwise have been available for distribution by the water projects was made unavailable.

The process was repeated the following year, with the issuance of a second biological opinion by NMFS, again finding the winter-run chinook salmon to be in jeopardy. The U.S. Fish and Wildlife Service then issued its own biological opinion—this one identifying the delta smelt to be at risk. Following each

---

1. *See* Act of Oct. 27, 1986, Pub.L. No. 99–546, 100 Stat. 3050; *Agreement between the United States of America and the State of California for Coordinated Operation of the Central Valley Project and the State Water Project* (November 24, 1986).

2. Where the activities of a federal agency are seen to jeopardize the continued existence of listed species or cause the destruction or adverse modification of critical habitats, the Endangered Species Act directs the Secretary to suggest "reasonable and prudent alternatives" to avoid such harms. 16 U.S.C. § 1536(b)(3)(A)(1994).

316

of these later-issued opinions, RPAs were adopted that again restricted the time and manner in which water could be pumped from the Delta, thereby limiting the water otherwise available to the water distribution systems.

On March 19, 1992, the State Water Resources Control Board addressed the NMFS's first biological opinion. Recognizing that the Bureau of Reclamation and the Department of Water Resources could not comply with the RPA and still meet the salinity requirements (i.e., water quality standards)[3] imposed on them by their permits from the State Water Resources Control Board, the Board concluded that the federal requirements under the ESA overrode the terms set forth in the permits. Citing its authority "under Water Code Sections 100 and 275, under its reserved jurisdiction in the permits and licenses of the USBR [Bureau of Reclamation] and DWR, and under its continuing authority pursuant to the public trust doctrine and the reasonableness doctrine, to take action in response to the prevailing drought conditions and the NMFS Reasonable and Prudent Alternative,"[4] the Board waived the salinity standards to which the projects were subject.

The RPAs were thus implemented in each of the years in question, giving rise to the present claims. According to plaintiffs, the restrictions imposed by the RPAs deprived

Tulare Lake Basin WSD of at least 9,770 acre-feet of water in 1992; at least 26,000 acre-feet of water in 1993, and at least 23,050 acre-feet of water in 1994. Kern County Water Agency, by contrast, is alleged to have lost a minimum of 319,420 acre-feet over that same period.

## DISCUSSION

The Fifth Amendment to the United States Constitution concludes with the phrase: "nor shall private property be taken for public use, without just compensation." The purpose of that clause—as the oft-quoted language from *Armstrong v. United States*, 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960) explains—is "to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." At issue, then, is not whether the federal government has the authority to protect the winter-run chinook salmon and delta smelt under the Endangered Species Act, but whether it may impose the costs of their protection solely on plaintiffs.

In arguing against the existence of a taking, the government offers three lines of defense. First, defendant maintains that the implementation of the RPAs merely frustrated the contract's purpose and, under *Omnia Commercial Co. v. United States*, 261 U.S. 502, 43 S.Ct. 437, 67 L.Ed. 773 (1923), did not

3. The salinity requirements, the product of eleven months of evidentiary hearings before the State Water Resources Control Board, were adopted in 1978 and are set forth in the Board's "Water Quality Control Plan for the Sacramento–San Joaquin Delta and Suisun Marsh" and in its "Water Right Decision 1485." ("D–1485.") Together, these two documents established new water quality standards for salinity control and for protection of fish and wildlife in the Delta, and modified earlier permits held by the Bureau of Reclamation and the Department of Water Resources, that required those agencies to adhere to the water quality standards set forth in the quality control plan.

4. The referenced sections of the California Water Code, Section 100 and Section 275, read respectively as follows:
It is hereby declared that because of the conditions prevailing in this State the general welfare requires that the water resources of the State be put to beneficial use to the fullest extent of which they are capable, and that the

waste or unreasonable use or unreasonable method of use of water be prevented, and that the conservation of such water is to be exercised with a view to the reasonable and beneficial use thereof in the interest of the people and for the public welfare. The right to water or to the use or flow of water in or from any natural stream or watercourse in this State is and shall be limited to such water as shall be reasonably required for the beneficial use to be served, and such right does not and shall not extend to the waste or unreasonable use or unreasonable method of use or unreasonable method of diversion of water.
Cal. Water Code § 100 (Deering 1977).
The department and board shall take all appropriate proceedings or actions before executive, legislative, or judicial agencies to prevent waste, unreasonable use, unreasonable method of use, or unreasonable method of diversion of water in this state.
Cal. Water Code § 275 (Deering 1977).

therefore effectuate a taking. Second, it argues that the criteria for a regulatory taking—specifically the existence of reasonable, investment-backed expectations and of a significant decrease in economic value—have not been met. Finally, defendant contends that the federal government cannot be held liable for a taking when it does no more than impose a limit on plaintiffs' title that the background principles of state law would otherwise require. We address these arguments in turn.

## I.

■ Defendant argues that *Omnia* stands for the proposition that the government may not be held liable for lawful actions that, though they may injure or destroy contract rights, do not take them as that phrase is understood in the constitutional sense. No taking occurs, defendant maintains, when "expectations under a contract are merely frustrated by lawful government action not directed against the takings claimant." *767 Third Avenue Assocs. v. United States*, 48 F.3d 1575, 1581 (Fed.Cir.1995). In defendant's view, the limitations imposed by the RPAs represent a legitimate exercise of federal authority that does no more than frustrate, rather than appropriate, plaintiffs' rights in water.

At issue in *Omnia* was a contract between Omnia and the Allegheny Steel Company that allowed Omnia to purchase large quantities of steel plate at a below-market price. When the government requisitioned the steel company's entire production of steel plate for the year, Omnia sued, alleging a taking of its right of priority to the steel plate. The Supreme Court denied Omnia's claim, concluding that the contract had merely been ended rather than appropriated.

In reaching its decision, the *Omnia* Court noted that the Fifth Amendment "has always been understood as referring only to a direct appropriation, and not to consequential injuries resulting from the exercise of lawful power." 261 U.S. at 510, 43 S.Ct. 437 (citation omitted). The Court went on to caution against confusing the contract, *i.e.*, an obligation to perform, with the subject matter of the contract, *i.e.*, steel:

The essence of every executory contract is the obligation which the law imposes upon the parties to perform it.... Plainly, here there was no acquisition of the obligation or the right to enforce it. If the steel company had failed to comply with the requisition, what would have been the remedy? Not enforcement of the contract but enforcement of the statute. If the government had failed to pay for what it got what would have been the right of the Steel Company? ·Not to the price fixed by the contract but to the just compensation guaranteed by the Constitution.

*Id.* at 510–511, 43 S.Ct. 437.

In defendant's view, the requisition of water in the instant case is directly analogous to the requisition of steel in *Omnia*. Like Allegheny Steel, DWR contracted to provide a future product whose delivery was made impossible by the government's lawful action. That action, defendant maintains, served merely to frustrate the contract rather than to appropriate it, since the government neither substituted itself as a contracting party nor assumed any of the rights or responsibilities under the contract.

Contrary to the government's assertion, however, we do not believe *Omnia* governs the present case. *Omnia*'s distinction between a contract that has been appropriated and one that has merely been frustrated is relevant only where the contract right that is claimed remains separate and distinct from the property that is the subject of the contract. Put differently, *Omnia* addresses those situations in which a litigant claims a contract right with regard to the property (*e.g.*, the right to buy it at a certain price) but cannot claim ownership of the property, since title to the property has not yet passed to the party seeking compensation. *See Cuban Truck and Equip. Co. v. United States*, 166 Ct.Cl. 381, 333 F.2d 873, 882 n. 18 (1964) (citing *Omnia* in support of the proposition that "[i]f title had not passed to plaintiff, its claim would merely be for frustration of its contract ... not for a taking or seizure of its property."). Under those circumstances, the contract holder can recover only if the government has actually appropriated the contract itself, *i.e.*, stepped into the shoes of the

contracting party and assumed the rights and responsibilities under the contract. But that is not our case.

Unlike the situation in *Omnia*, where the plaintiff could claim only a contract expectancy but not an ownership right in the steel, our plaintiffs can claim an identifiable interest in a stipulated volume of water. While under California law the title to water always remains with the state [5], the right to the water's use is transferred first by permit to DWR, and then by contract to end-users, such as the plaintiffs.[6] Those contracts confer on plaintiffs a right to the exclusive use of prescribed quantities of water, consistent with the terms of the permits. That right remains in place until formally changed by administrative process. Thus, we see plaintiffs' contract rights in the water's use as superior to all competing interests. It is a property interest sufficiently matured to take it out of the realm of an *Omnia* analysis.

## II.

■ Turning then to the merits of plaintiffs' claim, we begin by determining the nature of the taking alleged. Courts have traditionally divided their analysis of Fifth Amendment takings into two categories: physical takings and regulatory takings. A physical taking occurs when the government's action amounts to a physical occupation or invasion of the property, including the functional equivalent of a "practical ouster of [the owner's] possession." *Transportation Co. v. Chicago*, 99 U.S. 635, 642, 25 L.Ed. 336 (1878); *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982). When an owner has suffered a physical invasion of his property, courts have noted that "no matter how minute the intrusion, and no matter how weighty the public purpose behind it, we have re-

quired compensation." *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1015, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992).

■ A regulatory taking, in contrast, arises when the government's regulation restricts the use to which an owner may put his property. In assessing whether a regulatory taking has occurred, courts generally employ the balancing test set forth in *Penn Central*, weighing the character of the government action, the economic impact of that action and the reasonableness of the property owner's investment-backed expectations. *Penn Central Transp. Co. v. New York*, 438 U.S. 104, 124–125, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). Regulations that are found to be too restrictive, however—*i.e.*, those that deprive property of its entire economically beneficial or productive use—are commonly identified as categorical takings and, like physical takings, require no such balancing. *Lucas*, 505 U.S. at 1015–1016, 112 S.Ct. 2886.

■ Plaintiffs urge us to consider this action as a case involving a physical taking of property. Under that theory, plaintiffs possessed contract rights entitling them to the use of a specified quantity of water. By preventing them from using that water, plaintiffs argue, the government deprived them of the entire value of their contract right.

Defendant sees the case differently. In defendant's view, the court must examine the government's conduct under the three-part test that *Penn Central* prescribes for the evaluation of regulatory action that interferes with an owner's use of his property. Under that rubric, defendant contends, the claim must fail because plaintiffs' reasonable contract expectations were necessarily limited by regulatory concern over fish and wildlife; and because the economic loss asserted

---

5. Cal. Water Code § 102 provides: "All water within the State is the property of the people of the State, but the right to the use of water may be acquired by appropriation in the manner provided by law." Cal. Water Code § 102 (Deering 1977).

6. We accept that plaintiffs' contracts are derivative of the permit issued to DWR, and that the permit has not yet matured into a license. (A permit establishes a conditional priority of usage;

a license, in contrast, is a confirmed appropriative right.) We further acknowledge that plaintiffs possess rights not as direct appropriators of water, but as parties to a contract with an entity—DWR—entitled to appropriate water. Those observations, however, do not change our conclusion that plaintiffs' right to the *use* of water is a compensable contractual right outside the purview of *Omnia*.

here—a fraction of the master contract's overall value—was de minimis.

Of the two positions, plaintiffs', we believe, is the correct one. Case law reveals that the distinction between a physical invasion and a governmental activity that merely impairs the use of that property turns on whether the intrusion is "so immediate and direct as to subtract from the owner's full enjoyment of the property and to limit his exploitation of it." *United States v. Causby,* 328 U.S. 256, 265, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946). In *Causby,* for instance, the Court ruled that frequent flights immediately above a landowner's property constituted a taking, comparing such actions to a more traditional physical taking: "If, by reason of the frequency and altitude of the flights, respondents could not use this land for any purpose, their loss would be complete. It would be as complete as if the United States had entered upon the surface of the land and taken exclusive possession of it." *Id.* at 261, 66 S.Ct. 1062 (footnote omitted).

While water rights present an admittedly unusual situation, we think the *Causby* example is an instructive one. In the context of water rights, a mere restriction on use—the hallmark of a regulatory action—completely eviscerates the right itself since plaintiffs' sole entitlement is to the use of the water. *See Eddy v. Simpson,* 3 Cal. 249, 252–253 (1853) ("the right of property in water is usufructuary, and consists not so much of the fluid itself as the advantage of its use."). Unlike other species of property where use restrictions may limit some, but not all of the incidents of ownership, the denial of a right to the use of water accomplishes a complete extinction of all value. Thus, by limiting plaintiffs' ability to use an amount of water to which they would otherwise be entitled, the government has essentially substituted itself as the beneficiary of the contract rights with regard to that water and totally displaced the contract holder. That complete occupation of property—an exclusive possession of plaintiffs' water-use rights for preservation of the fish—mirrors the invasion present in *Causby.* To the extent, then, that the federal government, by preventing plaintiffs from using the water to which they would otherwise have been entitled, have rendered the usufructuary right to that water valueless, they have thus effected a physical taking.

Our characterization of water rights as the subject of a physical taking is confirmed by *International Paper Co. v. United States,* 282 U.S. 399, 51 S.Ct. 176, 75 L.Ed. 410 (1931). There, the Supreme Court, in assessing whether the government's acquisition of a corporation's entire right to water power constituted a taking, noted that "the petitioner's right was to the use of water; and when all the water that it used was withdrawn from the petitioner's mill and turned elsewhere by government requisition for the production of power it is hard to see what more the Government could do to take that use." *Id.* at 407, 51 S.Ct. 176. Similarly, in *Dugan v. Rank,* 372 U.S. 609, 625, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963), the Court made approving reference to cases that treated water rights as the object of physical seizure (*e.g., United States v. Gerlach Live Stock Co.,* 339 U.S. 725, 70 S.Ct. 955, 94 L.Ed. 1231 (1950); *Ivanhoe Irrigation Dist. v. McCracken,* 357 U.S. 275, 78 S.Ct. 1174, 2 L.Ed.2d 1313 (1958)), before noting that "[a] seizure of water rights need not necessarily be a physical invasion of land. It may occur upstream, as here. Interference with or partial taking of water rights in the manner it was accomplished here might be analogized to interference or partial taking of air space over land." The Court went on to conclude that "when the Government acted here 'with the purpose and effect of subordinating' the respondents' water rights to the Project's uses 'whenever it saw fit,' 'with the result of depriving the owner of its profitable use [there was] the imposition of such a servitude [as] would constitute an appropriation of property for which compensation should be made.'" *Id.* (alteration in original) (citation omitted).

Defendant attempts to distinguish these cases on the ground that each involved actual diversions of water by the government for its own consumptive use, whereas here, it is claimed, the government has merely regulated the plaintiffs' method of diverting water. Additionally, defendant argues that the government could not by law have physically appropriated plaintiffs' property right since

California does not recognize a right to appropriate water for in-stream uses (citing *Fullerton v. State Water Resources Control Bd.*, 90 Cal.App.3d 590, 153 Cal.Rptr. 518 (1979)).[7] But as defendant readily admits, the ultimate result of those rate and timing restrictions on pumping is an aggregate decrease in the water available to the water projects. Under those circumstances, whether the government decreased the water to which plaintiffs had access by means of a dam or by means of pumping restrictions amounts to a distinction without a difference.

## III.

Having concluded that a deprivation of water amounts to a physical taking, we turn now to the question of whether plaintiffs in fact owned the property for which they seek to be compensated. *See Palm Beach Isles Assocs. v. United States*, 231 F.3d 1354, 1357 (Fed.Cir.2000) (defining the inquiry in a physical takings case as whether the plaintiff owned the property at the time of the taking). Defendant argues that both the terms of plaintiffs' contracts and the background principles of state law impose limits on plaintiffs' titles that render their loss of water non-compensable. That is the case in the first instance, defendant contends, because plaintiffs' contracts entitle them only to the water made available to the Department of Water Resources. As the water—through no fault of DWR—was not made available to DWR, plaintiffs have no claim to the foregone flow. Additionally, defendant argues that plaintiffs' contract rights are subject to the public trust doctrine, the doctrine of reasonable use, and common law principles of nuisance, all of which provide for the protection of fish and wildlife. To the extent that the reductions in the water supply that plaintiffs suffered are designed to advance those interests, defendant argues, the reductions merely reflect the limitations of title inherent in the background principles of state law. And, defendant adds, no right to compensation attends the assertion of such background principles.

### i. Contract Language as a Limitation on Title

Under the terms of the water supply contracts, neither the state nor its agents may be held liable for "any damage, direct or indirect, arising from shortages in the amount of water to be made available for delivery to the Agency under this contract caused by drought, operation of area of origin statutes, or any other cause beyond its control." Para. 18(f). Defendant reads that language to mean that plaintiffs are entitled to receive water only to the extent that water is available to DWR. Because the imposition of federal use restrictions constitutes a cause beyond DWR's control, defendant argues, plaintiffs' contract rights are contingent on a condition that never occurred: the availability of water to DWR. Defendant's argument, in other words, amounts to the assertion that a litigant has a compensable property interest in a contract right only if he can press for its enforcement at law. Defendant cites *O'Neill v. United States*, 50 F.3d 677 (9th Cir.1995) in support of this position.

Having considered *O'Neill*, however, we conclude that it has no application to the present case. In *O'Neill*, water contractors in the federally-owned Central Valley Project sued under a breach of contract theory when the enforcement of the Endangered Species Act deprived them of water under their contracts. The *O'Neill* Court concluded that the government was not liable based on a provi-

---

7. *Fullerton*, we believe, is inapposite. At issue in *Fullerton* was an attempt by the state Department of Fish and Game to obtain a permit for an "in-stream" appropriation of water to provide minimum flow guarantees for protection of the fish. The *Fullerton* Court upheld the SWRCB's denial of the permit, reasoning that the preservation of the fish was but a single factor to be weighed by the Board in protecting the public trust, and that the reservation of water under such a permit would compromise the Board's balancing function, as it rendered the appropriated water unavailable for other yet unforeseen and overriding uses. It was in this context that the court concluded that a physical diversion or use was necessary to constitute an appropriation for the purposes of qualifying for an appropriative permit. 90 Cal.App.3d at 603, 153 Cal.Rptr. 518. That doctrine, however, has no application where, as here, the government has not applied for a permit to appropriate water for the fish's protection, but has instead effectuated a taking of appropriated water for that purpose.

sion in the contract holding the government not responsible for "any damage, direct or indirect, arising from a shortage on account of errors in operation, drought, or any other causes." That broad exemption from liability was found to include shortages of water due to implementation of the ESA.

In the present case, the federal government enjoys no such contractual immunity from liability. The comparable term in the plaintiffs' contracts—Paragraph 18(f)—insulates *DWR* from liability for circumstances beyond its control; not the federal government. The inclusion of Paragraph 18(f) in the contract does not render plaintiffs' interest in the water contingent; it merely provides DWR with a defense against a breach of contract action in certain specified circumstances. With that exception, plaintiffs' contract rights are otherwise fully formed against DWR, and certainly against a third party seeking to infringe on those rights. *O'Neill* can provide the government no defense to a taking.

### ii. The Public Trust Doctrine, the Doctrine of Reasonable Use and Nuisance Law

In addition to its contract-based argument, defendant offers a number of common law justifications for limiting the scope of plaintiffs' property right: specifically, that plaintiffs can have no vested right in a use or method of diverting water that is unreasonable or violates the public trust. In support of that position, defendant refers us to various SWRCB decisions, as well as to assorted background principles of state law for the proposition that plaintiffs' proposed use is unreasonable or in contravention of California water law.[8] The difficulty with defendant's argument, however, is that the water allocation scheme in effect for the period 1992–1994, as set forth in D–1485, specifically allowed for the allocations of water defendant now seeks to deem unreasonable. We explain further.

There is, as an initial matter, no dispute that all California water rights are subject to the universal limitation that the use must be both reasonable and for a beneficial purpose. Cal. Const. art. XIV, § 3, amended by Cal. Const. art. X, § 2. Included in that definition of reasonable use is the preservation of fish and wildlife. Indeed, the California legislature has specifically declared that the protection of fish and wildlife is among the purposes of the state water projects. Cal. Water Code § 11900 (Deering 1977).

Whether a particular use or method of diversion is unreasonable or violative of the public trust is a question committed concurrently to the State Water Resources Control Board and to the California courts. *See National Audubon Soc'y v. Superior Court of Alpine County,* 33 Cal.3d 419, 451–452, 189 Cal.Rptr. 346, 658 P.2d 709 (1983). Thus, while we accept the proposition that plaintiffs have no right to use or divert water in an unreasonable manner, nor in a way that violates the public trust, the issue now before us is whether such a determination has in fact been made.

Plaintiffs argue that the State Water Resources Control Board's decision D–1485—a comprehensive water rights scheme balancing the needs of and allocating water rights among competing users—defines the full scope of their contract rights. In plaintiffs' view, D–1485 represents the state's determination of various water rights, thereby reflecting the amount of water, under state law, they reasonably can expect and to which they are reasonably entitled. Plaintiffs argue that unless and until D–1485 is modified by the State Water Resources Control Board, or the terms of D–1485 are declared by that board or a California court to be unreasonable or violative of the public trust, DWR has a right recognized and protected under California law to divert water in accordance with D–1485.

---

8. Defendant cites a range of authority for the proposition that water rights do not extend to unreasonable methods of diversion, including diversions to the detriment of wildlife: *People ex. rel. State Water Resources Control Bd. v. Forni,* 54 Cal.App.3d 743, 126 Cal.Rptr. 851 (1976); *Envi-* *ronmental Defense Fund, Inc. v. East Bay Mun. Util. Dist.,* 26 Cal.3d 183, 161 Cal.Rptr. 466, 605 P.2d 1 (1980); *National Audubon,* 33 Cal.3d 419, 189 Cal.Rptr. 346, 658 P.2d 709; and orders WR 90–5; WR 91–01; WR 95–17 of the State Water Resources Control Board.

In defendant's view, D–1485 fails to encapsulate the board's approach to the endangerment of the delta smelt and salmon, both because it was promulgated before the fish were found to be in jeopardy, and because the board enacted D–95–1—a 1995 decision whose provisions adopt measures found in the RPAs—to protect the fish. Additionally, defendant argues that D–1485 should be read as an evolving document, one informed by later developments in water needs and altered by subsequent state actions. In support of that theory, defendant offers various state actions that it claims serve to limit plaintiffs' contract rights: California's listing as "endangered" under the California Endangered Species Act ("CESA") the winter-run chinook salmon in 1989 and the delta smelt in 1993; the Department of Water Resources's consultation with the National Marine Fisheries Service in formulating the biological opinions; and the California Department of Fish and Game's adoption of the 1993 NMFS biological opinion and the RPA under CESA.

We cannot accept defendant's position. As an initial matter, the responsibility for water allocation is vested in the State Water Resources Control Board. Cal. Water Code §§ 174, 179; *California v. United States*, 438 U.S. 645, 653, 98 S.Ct. 2985, 57 L.Ed.2d 1018 (1978). Once an allocation has been made—as was done in D–1485—that determination defines the scope of plaintiffs' property rights, pronouncements of other agencies notwithstanding. While we accept the principle that California water policy may be ever-evolving, rights based on contracts with the state are not correspondingly self-adjusting. Rather, the promissory assurances they recite remain fixed until formally changed. In the absence of a reallocation by the State Water Resources Control Board, or a determination of illegality by the California courts, the allocation scheme imposed by D–1485 defines the scope of plaintiffs' contract rights. None of the doctrines to which defendant resorts—the doctrine of reasonable use, the public trust doctrine or state nuisance law—are therefore availing.

Nor do we believe that the subsequent actions by the SWRCB were designed to supplant the findings of D–1485. Although the Board agreed to waive salinity requirements to enable compliance with the RPA, for instance, it did not revisit the water allocations set forth in D–1485 that were established after some eleven months of hearings. And while the administrative determinations issued by the SWRCB in 1995—the 1995 the Water Control Plan and the Water Right Decision 95–6—served to reallocate water allotments, they did so only after the period in dispute, and cannot therefore be construed as altering the scope of plaintiffs' contract rights for the 1992–1994 period.

Defendant argues against this position, urging us to anticipate how the Board or the California courts would apply the doctrine of reasonable use if the issue were before them. On that basis, defendant urges us to find that plaintiffs' proposed use of water is unreasonable—and therefore unlawful—to the extent that it endangers the fish. Defendant points to a myriad of state and federal actions as evidence that either the SWRCB or the California courts would have deemed plaintiffs' proposed use unreasonable. The issue, defendant contends, is not what limitations the state in fact imposed on plaintiffs' titles, but what limitations the state *could* have imposed under state background principles. Defendant cites *Rith Energy, Inc. v. United States*, 44 Fed.Cl. 108 (1999) for that proposition.

In *Rith Energy*, this court rejected the takings claim of a surface mining operator who was denied a federal permit to mine when it was determined that the mining operation would have polluted the state's groundwater. There, we concluded that "regulatory action that restrains an owner from the beneficial use of his property—even a restraint barring all such use—cannot become the basis of a compensable taking where the restraint that is imposed is grounded 'in the restrictions that background principles of the State's law of property and nuisance already place on land ownership.'" *Rith Energy*, 44 Fed.Cl. at 113 (quoting *Lucas v. South Carolina Coastal Council*, 505 U.S. at 1029, 112 S.Ct. 2886). Significant to the present case, the court went on to note that:

[r]estrictions on the use of property that have their source in federal law also come within this rule to the extent such restrictions do no more than mirror the results that could be reached under the state's nuisance law. *Loveladies Harbor*, 28 F.3d at 1182: "Since the federal power to regulate without risk of a taking is based on the state's nuisance law ... the federal authority, if exercised, is exercised at the risk of an absence of state authority."
*Id.* at 113.

The reasoning in *Rith Energy* was made more explicit in the court's later denial of a motion for reconsideration. There it explained that "whether the enforcement of [restrictions on the state's water resources] is accomplished by the state regulatory body or by federal officials acting under the authority of SMCRA [the Surface Mining Control and Reclamation Act] is not an issue relevant to the takings analysis. Under the holding of [*Lucas*], the test is whether the property use that is proscribed is based on 'restrictions that background principles of the State's law of property and nuisance already place upon land ownership.' Where that condition is met, no compensation is owed." *Rith Energy, Inc. v. United States,* 44 Fed.Cl. 366, 366–367 (1999) (internal citation omitted).

Defendant reads these statements to stand for the proposition that the state does not have to declare a use a nuisance or unreasonable before the federal government can, without effecting a taking, exercise its own regulatory powers to abate that use. Put differently, the issue, in defendant's view, is whether the use could have been prohibited under state water or nuisance law. If so, defendant argues, the federal government is free to operate within the regulatory space carved out by the state background principles, whether or not the state has preceded it.

Contrary to defendant's contention, however, *Rith Energy* does not stand for the principle for which it is cited. Crucial to the determination in *Rith Energy* was an adjudicated finding by the Department of Interior's Office of Hearing and Appeals—based on evidence that had not previously been submitted to the state licensing authority—that plaintiff's proposed mining activity would pollute the groundwater (a determination that was later upheld by the Interior Board of Land Appeals). Because the background principles of Tennessee law made clear that such contamination was prohibited, the action taken by the federal government did not represent merely what the state *could* have done under its police powers, but rather, what the court believed the state was *required* to do in light of the adjudication by the Department of the Interior establishing a "high probability" of aquifer contamination.

There was thus no displacement of the state regulatory regime by the federal government in *Rith Energy;* rather, the federal government merely made explicit—in an area over which it shared regulatory authority with the state—prohibitions that had always implicitly existed within state law. And it is that distinction that is crucial to understanding both *Rith Energy* and the case now before us. As the *Lucas* Court explained in describing those interests that, on the basis of nuisance principles, are non-compensable: "The use of these properties for what are now expressly prohibited purposes was *always* unlawful, and (subject to other constitutional limitations) it was open to the State at any point to make the implication of those background principles of nuisance and property law explicit." *Lucas,* 505 U.S. at 1030, 112 S.Ct. 2886.

That the use now being challenged was not always unlawful is evident from the fact that it was specifically authorized by the state in D–1485. Were we now to deem that use a nuisance, we would not be making explicit that which had always been implied under background principles of property law, but would instead be replacing the state's judgment with our own. That we cannot do.

Unlike the situation in *Rith Energy,* where the prohibition on the contamination of the drinking supply was clearly set forth in the state's common law and the fact of contamination was the subject of an adjudicated finding, our inquiry does not point to a single, discrete resolution. The public trust and reasonable use doctrines each require a complex balancing of interests—an exercise of

discretion for which this court is not suited and with which it is not charged.

To the extent that water allocation in California is a policy judgment—one specifically committed to the SWRCB and the California courts—a finding of unreasonableness by this court would be tantamount to our *making* California law rather than merely applying it. This is especially true where, as here, the Board charged with such determinations has responded, and continues to respond, to the concerns about fish and wildlife that the government was seeking to address through the implementation of the ESA.[9]

While we are often asked to interpret state or federal statutes or regulations to determine the scope of a property interest under a takings claim,[10] those determinations do not extend to matters of discretion committed to the authority of the state. Accordingly, we conclude that plaintiffs' right to divert water in the manner specified by their contracts and in conformance with D–1485 continued until a determination to the contrary was made either by the SWRCB or by the California courts. As no such determination was made during the period 1992–1994, and subsequent amendments to policy cannot, for contract purposes, be made retroactive, plaintiffs were indeed entitled to the water use provided for in D–1485 and in their contracts.

## CONCLUSION

There is, in the end, no dispute that DWR's permits, and in turn plaintiffs' contract rights, are subject to the doctrines of reasonable use and public trust and to the

tenets of state nuisance law. Nor is there serious challenge to the premise that the SWRCB, under its reserved jurisdiction, could at any time modify the terms of those permits to reflect the changing need of the various water users. The crucial point, however, is that it had not.

D–1485 is a comprehensive balancing of interests that recognized that while the "full protection" of fish was perhaps possible, it was not ultimately in the public interest. The SWRCB chose not to revisit that in-depth balancing of water needs and uses even as it reviewed the salinity standards it had set in response to NMFS's biological opinion. We need not attempt to discern the state's response to the threat, then, because the state has in fact spoken.

Nor can we, as defendant urges, make that determination ourselves. It is the Board that must provide the necessary weighing of interests to determine the appropriate balance under California law between the cost and benefit of species preservation. The federal government is certainly free to preserve the fish; it must simply pay for the water it takes to do so.

For the reasons stated, plaintiffs' motion for summary judgment must therefore be granted and defendant's cross-motion for summary judgment denied.

---

9. The California Court of Appeals has characterized D–1485 as "a policy judgment requiring a balancing of the competing public interests, one the Board is uniquely qualified to make in view of its special knowledge and expertise and its combined statewide responsibility to allocate the rights to, and to control the quality of, state water resources." *United States v. State Water Resources Control Bd.*, 182 Cal.App.3d 82, 130, 227 Cal.Rptr. 161 (1986). The fact that fish and wildlife concerns were considered in D–1485 is evident from the decision's language that "full protection" of all fish species was not obtainable without the "virtual shutting down of the project export pumps"—an alternative the Board rejected. D–1485 at 13. The Board opted instead for what was described as "a reasonable level of

protection." It is also notable that, since the 1992–1994 period that is the subject of suit, the SWRCB has indeed addressed the fish preservation issue: signing the "Principles for Agreement on Bay–Delta Standards between the State of California and the Federal Government" on December 15, 1994; adopting, after hearing and comment, WR 95–1, the 1995 Bay–Delta Plan, on May 22, 1995; and implementing various interim changes to D–1485 with regard to the responsibilities of water rights holders, including measures to ensure the preservation of fish.

10. *See, e.g., Del–Rio Drilling Programs Inc. v. United States*, 146 F.3d 1358 (Fed.Cir.1998).