CASITAS MUNICIPAL WATER DISTRICT, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 05–168L.

United States Court of Federal Claims.

March 29, 2007.

Roger J. Marzulla and Nancie G. Marzulla, Marzulla & Marzulla, Washington, DC, counsel for plaintiff.

William C. Kuhs, Kuhs & Parker, Bakersfield, CA, counsel for Tulare Lake Basin Water Storage District, Kern County Water Agency, Lost Hills Water District, and Wheeler Ridge–Maricopa Water Storage District, arguing as amicus curiae in support of plaintiff. Michael N. Nordstrom, of counsel.[1]

Kathleen L. Doster and James D. Gette, with whom was Assistant Attorney General Sue Ellen Wooldridge, U.S. Department of Justice, Environment and Natural Resources Division, Natural Resources Section, Washington, DC, counsel for defendant. Kaylee Allen, Department of the Interior, and Christopher Keifer, National Oceanic and Atmospheric Administration, of counsel.

John D. Echeverria and Sanjukta Misra, Georgetown Environmental Law & Policy Institute, Washington, DC, counsel for the Natural Resources Defense Council, arguing as amicus curiae in support of defendant.[2]

## OPINION

WIESE, Judge.

In an earlier decision issued in this case, the court rejected plaintiff's contention that plaintiff was entitled to contract damages for water allegedly lost because of restrictions on stream-flow diversions attributable to fish habitat protection requirements imposed under the authority of the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531–44 (2000). *Casitas Mun. Water Dist. v. United States*, 72 Fed.Cl. 746 (2006). Left for later decision was plaintiff's alternative contention: that the losses complained of, even if not redressable under a contract theory, nevertheless constitute a Fifth Amendment taking for which just compensation is due. With respect to this remaining issue, defendant has moved for partial summary judgment on the ground that the takings claim plaintiff alleges cannot be regarded as a physical or per se taking but instead must be addressed as a regulatory constraint on the use of property and therefore subject to evaluation under the criteria adopted in *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978).

In opposing defendant's motion, plaintiff claims that there are genuine issues of material fact in dispute, the resolution of which must await trial. Additionally, with respect to the substantive merits of the motion, plaintiff claims that defendant's position is erroneous as a matter of law. The taking alleged here, plaintiff contends, is recognized as a physical or per se taking under controlling case law. The parties have fully briefed the matter and the court heard oral argument on March 7, 2007. For the reasons set forth below, we decide in defendant's favor.

## FACTS

Plaintiff, Casitas Municipal Water District ("Casitas"), operates the Ventura River Project (the "Project") on behalf of the United States Bureau of Reclamation ("BOR") which owns and administers the Project in conformity with the Reclamation Act of 1902, Pub.L. No. 57–161, 32 Stat. 388, and other federal statutes. The Project supplies water to Ventura County, California, for the irrigation of farmland and for other municipal, industrial, and domestic uses. The Project consists of the Casitas Dam and Reservoir (otherwise known as "Lake Casitas"), the Robles Diversion Dam, the Robles–Casitas Canal, and a conveyancing system that includes pipelines, pumping plants, balancing reservoirs, and re-

---

1. In addition to the brief and argument offered by Tulare Lake Basin Water Storage District, et al., the court also received *amici curiae* briefs in support of plaintiff from *Karen Budd–Falen* and *Hertha L. Lund* on behalf of the New Mexico Cattle Growers Association, et al.; from *Daniel J. O'Hanlon* and *Julia E. Blair* on behalf of the Association of California Water Agencies, et al.; from *Jennifer Spaletta* on behalf of Stockton East Water District; and from *J. David Breemer* and *Damien M. Schiff* on behalf of the Pacific Legal Foundation.

2. In addition to the brief and argument offered by the Natural Resources Defense Council, the court also received an *amicus curiae* brief in support of defendant from *Deputy Attorney General Clifford T. Lee* and *Deputy Attorney General Tara L. Mueller* on behalf of the California State Water Resources Control Board.

lated structures. Operation of the Project is subject to rules and regulations prescribed by BOR. Plaintiff's basic right to the use of the Project water, by contrast, is subject to a license issued to Casitas by the California State Water Resources Control Board. The license grants plaintiff the right to divert and to use water from the Ventura River and its tributary (Coyote Creek) for beneficial purposes, subject to specific quantity limitations.[3]

On August 18, 1997, the National Marine Fisheries Service ("NMFS") listed the West Coast steelhead trout as an endangered species. As a result of this determination, it became unlawful under Section 9 of the ESA "for any person subject to the jurisdiction of the United States to ... take any such [endangered] species within the United States." 16 U.S.C. § 1538(a)(1) (2000).[4] In response to NMFS's action, Casitas requested BOR to pursue an informal consultation with NMFS pursuant to Section 7 of the ESA.[5] The purpose of this consultation was to seek advice and guidance from NMFS in the design, construction, operation, and maintenance of fish protection facilities, such as a fish ladder and fish screens (to avoid fish entrapment), to assist the upstream and downstream passage of migrating fish at the Robles Diversion Dam located on the Ventura River.

Over the next several years, representatives from Casitas and BOR met with NMFS biologists and engineers to discuss the various efforts that could be undertaken to preserve and improve the fish habitat in the Ventura River. The results of this process were reflected in a Biological Opinion issued by NMFS approving the design and construction of a fish passage facility and fish screens at the Robles Diversion Dam and the adoption of revised project operating criteria. The revised operating criteria—intended to augment flow requirements essential for fish migration and the preservation of their downstream habitat—prescribed an increase in downstream river flow volumes which correspondingly demanded a decrease in the amount of water Casitas would be allowed to divert. Casitas implemented the revised operating criteria pursuant to BOR's direction. The claim we now have before us is grounded on these revised project operating criteria. Specifically, plaintiff contends that the restrictions on water diversion that were adopted in the Biological Opinion have required Casitas permanently to forgo the exercise of a right to divert up to an additional 3,200 acre-feet of water per year from the Ventura River for irrigation purposes.

## DISCUSSION

The Fifth Amendment to the United States Constitution provides in relevant part: "nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V, cl. 4. Although the mandate these words announce is without limitation, courts have long recognized that "[g]overnment hardly could go on if to some extent values incident to private property could not be diminished without paying for every ... change in the general law." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 413, 43 S.Ct. 158, 67 L.Ed. 322 (1922).

Guided by this principle, modern day takings jurisprudence recognizes an unconditional right to compensation pursuant to the Fifth Amendment when the government: (i) directly appropriates private property, *see, e.g., Dugan v. Rank*, 372 U.S. 609, 625, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963) (identifying the government's diversion and storage of water from the San Joaquin River which deprived downstream riparian landowners of the water's use as "the imposition of such a

---

**3.** Casitas's license permits it to divert up to 107,800 acre-feet per year, including water placed into storage, and to put up to 28,500 acre-feet per year to beneficial use.

**4.** To "take" an endangered species as that term is used in the ESA means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in such conduct." 16 U.S.C. § 1532(19).

**5.** Pursuant to Section 7 of the ESA, a "consultation with and with the assistance of the Secretary" is the first step in the process of determining whether any action that is authorized, funded, or carried out by a federal agency is "likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species." 16 U.S.C. § 1536(a)(2).

servitude [as] would constitute an appropriation of property for which compensation should be made"); (ii) physically occupies private property, *see, e.g., Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 434–35, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982) (recognizing that a New York law requiring landlords to allow cable companies to install cable facilities in their apartment buildings constitutes a governmental action subject to the "historical rule that a permanent physical occupation of another's property is a taking," "without regard to whether the action achieves an important public benefit or has only minimal economic impact on the owner"); and (iii) imposes a regulatory constraint on the use of property so severe as to deprive an owner of all economically beneficial use, *see, e.g., Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1029–30, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992) (describing the state's enactment of beachfront building restrictions barring a previously lawful use of property as a "confiscatory regulation[ ]" and, hence, a taking, where the restrictions deprived the property of all economic value by prohibiting construction of any private residences).

■ Beyond the categories of per se takings described above, the determination of whether a government intrusion upon the rights of private property effects a taking requires the application of a multi-factor balancing test. This test, which reflects the standards set forth in *Penn Central*, 438 U.S. at 124, 98 S.Ct. 2646, examines the challenged regulatory action in terms of three factors: (i) the extent to which the regulation interferes with investment-backed expectations; (ii) the economic impact of the regulation on the claimant; and (iii) the character of the government's action. As the Supreme Court explained in *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 540, 125 S.Ct. 2074, 161 L.Ed.2d 876 (2005), the thrust of the *Penn Central* inquiry "turns in large part, albeit not exclusively, upon the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests."

■ It is against this background of takings jurisprudence that this court decided *Tulare Lake Basin Water Storage District v. United States*, 49 Fed.Cl. 313 (2001), the case on which plaintiff now relies and whose correctness as well as applicability defendant in turn contests. The plaintiffs in *Tulare* were California water users who had contracted with California's Department of Water Resources for the delivery of water subject to limitations resulting only from natural causes. The action that triggered the lawsuit was plaintiffs' loss of water due to steps taken by BOR in response to a Biological Opinion addressing fish habitat concerns issued by NMFS under the authority of the ESA. Specifically, through its control of the gates that managed the flow of water through a cross-channel aqueduct (the Delta Cross Channel), BOR caused water that otherwise would have been diverted for plaintiffs' use to remain in the river for fish protection purposes. Plaintiffs argued that this diversion of water amounted to a physical taking. This court agreed.

In endorsing the *Tulare* plaintiffs' argument, we relied, *inter alia*, on several water rights cases, among them *United States v. Gerlach Live Stock Co.*, 339 U.S. 725, 70 S.Ct. 955, 94 L.Ed. 1231 (1950); *Dugan v. Rank*, 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15; and *International Paper Co. v. United States*, 282 U.S. 399, 51 S.Ct. 176, 75 L.Ed. 410 (1931). In *Gerlach*, the Supreme Court upheld an award of just compensation where the government's diversion of the water from the San Joaquin River into the Friant Dam for redistribution to other landowners deprived plaintiffs of the irrigation benefits of the river's seasonal overflows. The Court explained its ruling as follows: "No reason appears why those who get the waters should be spared from making whole those from whom they are taken. Public interest requires appropriation; it does not require expropriation." 339 U.S. at 752–53, 70 S.Ct. 955.

A more expansive exposition of the Supreme Court's views on the same subject came thirteen years later in *Dugan*, where the Court again confronted a claim by riparian landowners for the diminution in stream flow caused by the government's diversion of water from the San Joaquin River. In

recognizing the compensability of plaintiffs' loss, the Court stated:

> The right claimed here is to the continued flow of water in the San Joaquin and to its use as it flows along the landowner's property. A seizure of water rights need not necessarily be a physical invasion of land. It may occur upstream, as here. Interference with or partial taking of water rights in the manner it was accomplished here might be analogized to interference or partial taking of air space over land, such as in our recent case of *Griggs v. Allegheny County*, 369 U.S. 84, 89–90, 82 S.Ct. 531, 7 L.Ed.2d 585 (1962). Therefore, when the Government acted here "with the purpose and effect of subordinating" the respondents' water rights to the Project's uses "whenever it saw fit," "with the result of depriving the owner of its profitable use, [there was] the imposition of such a servitude [as] would constitute an appropriation of property for which compensation should be made."

372 U.S. at 625, 83 S.Ct. 999 (citations omitted).

Finally, in *International Paper*, the government requisitioned the entire output of a hydroelectric facility resulting in a cutoff of power to plaintiff's sawmill operations. In response to the government's argument that there was no taking but simply a revocation of plaintiff's licensed right to the use of water, the Supreme Court stated:

> There is no room for quibbling distinctions between the taking of power and the taking of water rights. The petitioner's right was to the use of the water; and when all the water that is used was withdrawn from the petitioner's mill and turned elsewhere by government requisition for the production of power it is hard to see what more the Government could do to take the use.

282 U.S. at 407, 51 S.Ct. 176.

Based on these decisions—*Gerlach, Dugan*, and *International Paper*—we concluded that where a nonpossessory right of use—such as a water right—is displaced or abridged by a governmental action, the property owner has been caused to suffer a loss—the imposition of a servitude—that is akin to the dislocation occasioned by a physical occupation. This, then, is the view we carried forward in *Tulare*.

Admittedly, in *Tulare*, our focus was upon the finality of the plaintiffs' loss rather than upon the character of the government's action. Thus, in *Tulare*, we found unappealing defendant's contention that *Dugan* was distinguishable (and, by implication, *Gerlach* and *International Paper* as well) on the ground that the harm occasioned there was prompted by intrusive acts of the government directed to its own needs whereas in *Tulare*, the government was merely regulating plaintiffs' method of diverting water. In rejecting defendant's argument, we explained:

> [A]s defendant readily admits, the ultimate result of [the] rate and timing restrictions on pumping is an aggregate decrease in the water available to the water projects. Under those circumstances, whether the government decreased the water to which plaintiffs had access by means of a dam or by means of pumping restrictions amounts to a distinction without a difference.

49 Fed.Cl. at 320. It is this pronouncement that is under attack here.

In its motion for partial summary judgment, defendant asks us to reexamine this ruling. Accepted principles of takings jurisprudence, defendant maintains, dictate that in determining whether a taking has occurred, the court must first consider the character of the government's action rather than the harm that action may have caused. In addition, defendant continues, when that action involves regulatory restrictions on the use of property, as is the case here, the takings analysis requires application of the *Penn Central* factors. By contrast, defendant goes on to say, the physical or per se taking recognized in *Tulare* is legally correct only when the government has physically invaded property or appropriated property for its own or another's use. It is this last point, concludes defendant, that explains the takings recognized in the water rights cases.

In substantiation of this position, defendant refers us to a number of cases, among them *Tahoe–Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency,*

535 U.S. 302, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002). In *Tahoe–Sierra,* the Supreme Court rejected the assertion that a moratorium on residential land development was analogous to a physical taking and thus constituted a categorical or per se taking. The Court explained its ruling as follows:

> This longstanding distinction between acquisitions of property for public use, on the one hand, and regulations prohibiting private uses, on the other, makes it inappropriate to treat cases involving physical takings as controlling precedents for the evaluation of a claim that there has been a "regulatory taking," and vice versa. For the same reason that we do not ask whether a physical appropriation advances a substantial government interest or whether it deprives the owner of all economically valuable use, we do not apply our precedent from the physical takings context to regulatory takings claims. Land-use regulations are ubiquitous and most of them impact property values in some tangential way—often in completely unanticipated ways. Treating them all as *per se* takings would transform government regulation into a luxury few governments could afford. By contrast, physical appropriations are relatively rare, easily identified, and usually represent a greater affront to individual property rights. "This case does not present the 'classi[c] taking' in which the government directly appropriates private property for its own use," *Eastern Enterprises v. Apfel,* 524 U.S. 498, 522, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998); instead the interference with property rights "arises from some public program adjusting the benefits and burdens of economic life to promote the common good," *Penn Central,* 438 U.S., at 124, 98 S.Ct. 2646.

535 U.S. at 323–25, 122 S.Ct. 1465 (footnotes omitted).

Defendant urges us to heed the caution expressed in *Tahoe–Sierra* and thus to recognize that restrictions on the use of property, short of those that deprive an owner of all economically beneficial use of the property, do not qualify as categorical takings but must be treated as regulatory takings subject to analysis under the *Penn Central* factors.

That analysis, urges defendant, is what the court must follow here.

Plaintiff disagrees. Water, plaintiff points out, is a unique asset, the value of which is tied exclusively to its use, and when its use is restricted or denied, all value is lost. Even more to the point here, contends plaintiff, is that the government has caused the water to be directed to a different use. By contrast, plaintiff continues, a regulatory restriction affecting the use of land typically does not deprive the owner of all value—the owner is not dispossessed, the right to exclude others is not lost, and the property is not applied to a different use by the government. This fundamental difference between regulatory restrictions on the use of water and those affecting the use of land, plaintiff maintains, underpins or explains the per se takings recognized in *Gerlach, Dugan,* and *International Paper* and counsels against the regulatory takings analysis defendant urges the court to adopt here.

Despite the seeming simplicity of the question before us, we do not find it an easy one to decide. Defendant, as we have said, would have us start with the premise that a takings claim arising out of regulatory restrictions on the use of property must be evaluated under the *Penn Central* criteria. Yet, those criteria—the character of the government's action, its economic impact on the claimant, and the extent to which it interferes with the claimant's investment-backed expectations—and the balancing of considerations those criteria require, bring us almost immediately to the point plaintiff emphasizes here and the point the court finds most troubling: that which defendant labels simply as a passive restriction on use in reality amounts to a transfer of value through which plaintiff's right of use is diminished and the public right of use is simultaneously enlarged. For plaintiff, then, this restriction on use is seen as the functional equivalent of a physical taking. Thus, the question becomes whether the restrictions on plaintiff's water diversion, like a permanent physical invasion, and the accompanying loss those restrictions engender, constitute "government action of such a unique character that it is a taking without regard to other factors a court might ordinarily examine." *Loretto,* 458 U.S. at 432, 102 S.Ct. 3164.

Tempted though we may be to answer this question in the affirmative, *Tahoe–Sierra* counsels against our doing so. That case compels us to respect the distinction between a government takeover of property (either by physical invasion or by directing the property's use to its own needs) and government restraints on an owner's use of that property. Although from the property owner's standpoint there may be no practical difference between the two, *Tahoe–Sierra* admonishes that only the government's active hand in the redirection of a property's use may be treated as a per se taking. In short, we cannot make of this case another *Dugan.*

### CONCLUSION

For the reasons set forth above, defendant's motion for partial summary judgment is granted.[6]

---

**6.** As noted at the outset of this opinion, plaintiff based its opposition to defendant's motion not only on substantive law grounds but also on the contention that the motion is procedurally out of place because of the claimed existence of a bona-fide dispute between the parties with respect to material facts. Specifically, in its opposition, plaintiff identified the following areas of disagreement between the parties:

(i) whether plaintiff obtained a permit from the California State Water Resources Control Board to operate the Project;

(ii) whether control of the operations of the Project is lodged with plaintiff or BOR;

(iii) whether the 1959 operational criteria and the interim 2000 operational criteria for the Project were determined by plaintiff or BOR;

(iv) the scope of plaintiff's water rights; (continued ...)

(v) the amount of water allegedly taken; and

(vi) whether plaintiff has had a nearly full reservoir for the past two years.

In deciding the issue presented in defendant's motion for partial summary judgment, we have remained mindful of plaintiff's assertions regarding these allegedly disputed issues of fact. Nothing we have decided in this opinion, however, has engaged any of these issues; their resolution is not material to the question of whether the allegations of a taking based on the restrictions on water diversion imposed by the Biological Opinion are to be judged as a physical or per se taking or examined instead under the *Penn Central* criteria.