# United States Court of Appeals for the Federal Circuit

04-5126

TEXAS STATE BANK
(successor by merger to COMMUNITY BANK & TRUST),

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

Blake Henry Bailey, Bailey Law Firm, of Tyler, Texas, argued for plaintiff-appellant.  With him on the brief was J. Bennett White, Wilson, Sheehy, Knowles, Robertson & Cornelius, P.C., of Tyler, Texas.

Kyle Chadwick, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee.  With him on the brief were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, and Mary A. Melnick, Assistant Director.  Of counsel on the brief were Richard M. Ashton, Associate General Counsel, and Katherine Wheatley, Assistant General Counsel, Board of Governors of the Federal Reserve System, of Washington, DC.

Appealed from:  United States Court of Federal Claims

Senior Judge Bohdan A. Futey

# United States Court of Appeals for the Federal Circuit

04-5126

TEXAS STATE BANK
(successor by merger to COMMUNITY BANK & TRUST),

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

_____

DECIDED:  September 21, 2005

_____

Before NEWMAN, SCHALL, and DYK, Circuit Judges.

Opinion for the court filed by Circuit Judge DYK.  Opinion filed by Circuit Judge NEWMAN concurring in part, dissenting in part.

DYK, Circuit Judge.

Appellant Texas State Bank ("Texas State") is a state-chartered bank that holds (and has held) reserves in accordance with the requirements of the Monetary Control Act of 1980, Pub. L. 96-221, Title I, 94 Stat. 132.  Texas State claims that a Fifth Amendment taking occurred when the United States allegedly directed the Federal Reserve Board to pay earnings generated by Texas State's mandated reserves to the United States Treasury ("Treasury").

The Court of Federal Claims dismissed for lack of jurisdiction, holding that Texas State's "action [was] directed against the activities of the Federal Reserve Board"; that

the Federal Reserve Board was a non-appropriated funds instrumentality ("NAFI"); and that the NAFI doctrine precluded the exercise of subject matter jurisdiction. Tex. State Bank (successor by merger to Cmty. Bank & Trust) v. United States, 60 Fed. Cl. 815, 819 (2004). We hold that the Court of Federal Claims had jurisdiction under the Tucker Act because Texas State's claim is based on actions by the United States and not the Federal Reserve Board. We conclude that the case must nonetheless be dismissed because Texas State has failed to assert a valid takings claim.

## BACKGROUND

The Federal Reserve System was established in 1913 pursuant to the Federal Reserve Act ("FRA"). Federal Reserve Act, Pub. L. No. 63-43, 38 Stat. 251, codified as amended at 12 U.S.C. §§ 221 et seq. (1913). A principal function of the Federal Reserve System has been to determine and implement monetary policy "so as to promote effectively the goals of maximum employment, stable prices, and moderate long-term interest rates." 12 U.S.C. § 225a. The System is composed of the Board of Governors of the Federal Reserve System and twelve regional Reserve banks ("the Federal Reserve"). Monetary policy is set by the Federal Open Market Committee and is implemented through open market operations, that is, the purchase and sale of government securities. Open market operations are funded with reserves supplied by participating banks, and these operations are profitable for the Federal Reserve. The Federal Reserve banks also provide check clearing and other banking services to financial institutions. See generally 12 U.S.C. §§ 221 et seq.

Before the passage of the Monetary Control Act of 1980, only national banks were required to join the Federal Reserve System and to maintain non-interest bearing,

04-5126                                    2

or "sterile" reserves with the Federal Reserve. State-chartered banks could elect to join, but their participation in the system was not mandatory. Member banks did not earn interest on reserves, but were entitled to several free services, including free check-clearing. When inflation rates rose in the late 1970's and interest rates increased, voluntary participation of state-chartered banks in the Federal Reserve System declined as did the level of reserve deposits. See generally Joshua N. Feinman, Reserve Requirements: History, Current Practice, and Potential Reform, 79 Fed. Res. Bull. 569 (1993).

In 1980 Congress sought to reverse this trend through the passage of the Monetary Control Act, and required that all depositary institutions, i.e., all banks, hold sterile reserves, in the form of non-interest bearing deposits at the Federal Reserve Bank, or in the form of Federal Reserve notes (that is, currency) stored at the depository institution. The currency deposits are known as "vault cash." Id.; 12 U.S.C. § 461(c). The Federal Reserve has consistently, but unsuccessfully, urged Congress to allow for the payment of a market-rate of interest on required reserves.[1] On the other hand, the

---

[1] The Federal Reserve has taken the position that "[n]oninterest-bearing reserve requirements represent a tax on depository institutions that is not borne by other suppliers of financial services [and which] impairs the efficiency of resource allocation. . . . Paying such interest would circumvent the ill-effects of reserve requirements while preserving their advantages for monetary policy. . . . [R]eserve requirements provide for a reasonably predictable demand for overall reserve balances [which] is essential for the effective implementation of open market operations." Letter from Alan Greenspan, Chairman, Board of Governors of Federal Reserve System, to Rep. Stephen Neal, Chairman, Subcommittee on Domestic Monetary Policy of House Committee on Banking, Finance, and Urban Affairs (March 6, 1992).

Treasury has opposed what it views as "the use of taxpayer resources for this purpose."[2]

The parties have stipulated that the Federal Reserve's open market operations, funded by required reserves, generate substantial income. The parties have also stipulated that the "Federal Reserve notes held as mandatory reserves in the form of vault cash result in earnings for Federal Reserve Banks in the same manner the maintenance of reserve balances in the accounts at the Federal Reserve Banks generate [sic] income for the Federal Reserve Banks." Pl. Contentions Together with Defendant's Responses at ¶ B5. The income generated by the sterile deposits and vault cash is used to pay the expenses of the Federal Reserve, and the remainder is transferred by the Federal Reserve Banks to the Treasury on a yearly basis. This transfer occurs each year by direction of Treasury. In fiscal years 1997, 1998, and 2000, the transfer was statutorily mandated. Omnibus Budget Reconciliation Act of 1993, Pub. L. 103-66 § 3002(a), 107 Stat. 312; Appendix to District of Columbia Appropriations Act, Pub. L. 106-113, § 302, 113 Stat. 1501 (Nov. 29, 1999).

Texas State has maintained sterile reserves and vault cash in accordance with the Monetary Control Act since 1980. Cmty. Bank & Trust v. United States, 54 Fed. Cl. 352, 354 (2002).[3] In October 2001, Texas State brought suit against the United States in the Court of Federal Claims, alleging jurisdiction under the Tucker Act, 28 U.S.C. § 1491(a)(1). Texas State did not challenge the statutory requirement to maintain

---

[2] Testimony of Treasury Acting Under Secretary Donald V. Hammond before the Subcommittee on Financial Institutions and Consumer Credit of the Committee on Financial Services, U.S. House of Representatives, March 13, 2001.

[3] Texas State is the successor by merger to Community Bank and Trust, the party which made the deposits in earlier years.

reserves pursuant to the Monetary Control Act, nor allege that such a requirement constituted a taking.[4]  Rather, in its complaint, Texas State asserted that "[i]ncome on the principal is the property of the owner of the principal.  As such, the income on deposits and vault cash belong [sic] to the depository institutions that have maintained required reserves."  Complaint at ¶ 28.  Texas State alleged that the United States had engaged in a Fifth Amendment taking by directing the Federal Reserve to transfer the "earnings on required reserves maintained by depository institutions" to the Treasury. Id. at ¶¶ 28-31.  The complaint also alleged, in the alternative, a violation of due process or an illegal exaction. Id. at ¶¶ 30-31.  Texas State sought money damages equal to the earnings plus interest.  Id. at ¶ 32.   It also sought certification of a class of similarly situated depositary institutions that since 1980 maintained required reserves in accordance with the Monetary Control Act.  Id. at ¶¶ 20, 22.

The government moved to dismiss, arguing that jurisdiction was precluded because the Federal Reserve was a non-appropriated funds instrumentality ("NAFI"), and the NAFI doctrine barred suit.   Cmty. Bank & Trust, 54 Fed. Cl. at 355-59.[5]  The NAFI doctrine is "an established exception to the Tucker Act . . . based on the premise that the government has never waived its sovereign immunity to allow private parties to bring breach of contract claims against NAFIs."  AINS, Inc. v. United States, 365 F.3d

---

[4]    Under our decision in Commonwealth Edison Co. v. United States, the "mere imposition of an obligation to pay money . . . does not give rise to a claim under the Takings Clause of the Fifth Amendment."  271 F.3d 1327, 1340 (Fed. Cir. 2001) (en banc).

[5]    The government also argued that the claim was time-barred by the Tucker Act's six-year statute of limitations, 28 U.S.C. § 2501. The Court of Federal Claims disagreed, holding that Texas State's cause of action—as limited to the damages claimed for the statutory six years prior to the date of the complaint—had accrued within the limitations period.  Cmty. Bank & Trust, 54 Fed. Cl. at 355-56, 361.

1333, 1336 (Fed. Cir. 2004). In response, Texas State pointed out that this case involves a takings claim rather than an effort to recover on a government contract. Texas State also argued that it was the actions of Congress and Treasury that were the cause of the alleged taking, not those of the Federal Reserve, and that the NAFI doctrine did not apply. Cmty. Bank & Trust, 54 Fed. Cl. at 356. In the alternative, the government moved to dismiss for failure to state a claim, and Texas State moved for partial summary judgment with respect to liability on its takings claim, contending that in light of the "interest follows principal" holdings of the Supreme Court's decisions in Webb's Fabulous Pharmacies, Inc. v. Beckwith, 449 U.S. 155 (1980), and Phillips v. Washington Legal Foundation, 524 U.S. 156 (1998), the "payment of interest on its principal to the Treasury [was] a taking as a matter of law." 54 Fed. Cl. at 360.

In an initial opinion, the court declined to dismiss for lack of jurisdiction under the NAFI doctrine, and "reserve[d] judgment on the relevance and consequence of the Board of Governors' NAFI status until additional facts [became] available." Id. at 356. With respect to the merits of the takings claim, the court denied the government's motion to dismiss for failure to state a claim, and held that "[f]or the limited purpose of this motion to dismiss, the court finds that plaintiff has a property interest in the principal of its reserve accounts, cognizable under the Fifth Amendment." Id. at 359. However, the court noted that it was not "clear, for instance, that plaintiff's funds are placed in the type of separate, interest bearing . . . account at issue in" potentially analogous cases. Id. The court also denied the plaintiff's partial summary judgment motion. The case was then stayed, pending the outcome of the Supreme Court's decision in Brown v. Legal Foundation of Washington, 538 U.S. 216 (2003), where certiorari had been

04-5126                                    6

granted to determine whether or not a taking occurred when the State of Washington required that interest earned on IOLTA accounts be paid to government-designated organizations providing legal services to the poor.

The Supreme Court decided <u>Brown</u> in March 2003, holding that transfer of interest earned in IOLTA accounts to pay for legal services for the poor constituted a <u>per se</u> taking, but that no compensation was due because there was no net loss to the clients who owned the principal. <u>Id.</u> at 235-37. In June 2004, after further briefing and an evidentiary hearing on the merits, the Court of Federal Claims dismissed this action for lack of jurisdiction without reaching the merits. <u>Tex. State</u>, 60 Fed. Cl. at 821. The court held that the Federal Reserve was a NAFI and that the NAFI doctrine barred jurisdiction over takings claims against the United States based on actions taken by NAFIs. The court rejected Texas State's argument that the United States was the responsible party, finding that "[a]t bottom . . . its action is directed against the activities of the Federal Reserve." <u>Id.</u> at 819.

Texas State timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3). <u>Folden v. United States</u>, 379 F.3d 1344, 1354 (Fed. Cir. 2004). Following oral argument, we ordered the parties to submit supplemental briefing addressing the question "[w]hether Texas State Bank had a cognizable property interest in any portion of the net earnings of the Federal Reserve Board during the years in question."

DISCUSSION

I

A decision of the Court of Federal Claims "to dismiss a complaint for lack of jurisdiction is a question of law subject to . . . independent review by this court." <u>Shearin</u>

v. United States, 992 F.2d 1195, 1195 (Fed. Cir. 1993); see also AINS, 365 F.3d at 1336; Core Concepts of Fl., Inc. v. United States, 327 F.3d 1331, 1334 (Fed. Cir. 2003). We conclude that the Court of Federal Claims erred in dismissing the action for lack of jurisdiction pursuant to the NAFI doctrine.

We recently had occasion to review the NAFI doctrine in the takings context in Lion Raisins, Inc. v. United States, 416 F.3d 1356, 1365-66 (Fed. Cir. 2005). The doctrine has its origins in the Supreme Court's decision in Standard Oil Co. v. Johnson, 316 U.S. 481, 485 (1942), where the Court, in ruling that Army "post-exchanges" qualified for a federal government exemption from a California state tax, found that the "post exchanges as now operated are arms of the Government" but that the "Government assumes none of the obligations of the exchanges." Id. Since Standard Oil, we have repeatedly held that the NAFI doctrine precludes the exercise of Tucker Act jurisdiction over contract claims against the United States based upon the contracting activities of NAFIs that are not expressly mentioned in 28 U.S.C. § 1491(a)(1).[6] See Lion Raisins, 416 F.3d at 1365-66 (collecting cases of this court and of our predecessor, the Court of Claims). These cases have applied "[t]he general rule . . . that the Court of Federal Claims lacks jurisdiction to grant judgment against the United States on a claim against a NAFI because the United States has not assumed

---

[6]     In 1970, Congress amended the Tucker Act to allow jurisdiction over contract claims against the armed forces exchanges, adding the following sentence to 28 U.S.C. § 1491(a)(1):  "For the purpose of this paragraph, an express or implied contract with the Army and Air Force Exchange Service, Navy Exchanges, Marine Corps Exchanges, Coast Guard Exchanges, or Exchange Councils of the National Aeronautics and Space Administration shall be considered an express or implied contract with the United States."  See generally McDonald's Corp. v. United States, 926 F.2d 1126, 1129-31 (Fed. Cir. 1991) (discussing the 1970 amendments and their legislative history).

the financial obligations of those entities by appropriating funds to them." El-Sheikh v. United States, 177 F.3d 1321, 1324 (Fed. Cir. 1999) (quotation marks and citations omitted); see also United States v. Hopkins, 427 U.S. 123, 127 (1976).

The United States asserts that, under our precedent, the Federal Reserve Board is a NAFI. See AINS, 365 F.3d at 1340; Denkler v. United States, 782 F.2d 1003, 1004-05 (Fed. Cir. 1986); accord Research Triangle Inst. v. Bd. of Gov. of the Fed. Res. Sys., 132 F.3d 985 (4th Cir. 1997). The government further urges that the NAFI jurisdictional bar be extended beyond contract claims, to encompass takings claims against the United States based on actions by a NAFI. This argument was recently rejected in Lion Raisins, where we concluded that the United States may properly be sued in the Court of Federal Claims for any takings that are allegedly consummated by NAFIs acting as its agents, finding "no basis in the text of the Tucker Act itself; the legislative history of the 1970 amendments; or in the decisions of the Supreme Court or this court, for limiting the scope of the jurisdictional grant over claims 'against the United States . . . founded upon the Constitution' to exclude takings claims against the United States based on actions by NAFIs." Lion Raisins, 416 F.3d at 1367-68. Here, however, we do not reach the question of whether the actions of the Federal Reserve can impose takings liability on the United States. We hold that, contrary to the decision of the Court of Federal Claims, it is the actions of the United States, and not those of the Federal Reserve, which are alleged to give rise to the takings claim.

II

As originally stated in its complaint, confirmed in its filings before the Court of Federal Claims, and reiterated before this court during oral argument, the only action

04-5126                                    9

being challenged by Texas State is the compulsion by Congress or the Treasury that the Federal Reserve transfer to the Treasury its net earnings, earnings which were based in part on income from open market operations funded by required reserves. Indeed, Texas State contends that these transfers were effected over the objections of the Federal Reserve, and that the United States "compels the Federal Reserve to send earnings on required reserves to the Treasury rather than pay such earnings to depository institutions that maintain required reserves." Pl. Contentions Together with Defendant's Responses at ¶ I.7. Texas State argues that these earnings were its property, and that by directing the Federal Reserve to transfer its property to the Treasury, the United States accomplished a Fifth Amendment taking.

Here, it is alleged that the United States was responsible for directing the transfer of earnings to the Treasury, and the Federal Reserve had no discretion but to comply.[7] When the action that constitutes the taking is compelled by government, then the government can be held liable for the taking. For example, in International Paper Co. v. United States, 282 U.S. 399 (1931), the Supreme Court found the United States liable for a taking when the Secretary of War ordered a private power company to divert water from the owners of water-rights to increase power production for government uses. In that case, the requisition order covered "all of the water capable of being diverted" and was "intended to cut off the water being taken by the International Paper Company [pursuant to their lease with the power company] and thereby increase [the power

---

[7] While the calculation of net earnings "depends on the expenses of the Federal Reserve, which are largely discretionary," 60 Fed. Cl. at 819, the Federal Reserve exercises no discretion with respect to the action alleged to constitute the taking--the transfer of earnings generated by use of Texas State's reserves to the Treasury.

04-5126                          10

company's] productive capacity." Id. at 405-06. The Court found that "it [was] hard to see what more the Government could do to take the use" when the requisition order directed the power company to withdraw water from the petitioner's mill and turn it elsewhere, to produce power for the benefit of the government. Id. at 407.

Our decisions also have recognized that a Fifth Amendment taking may occur when the government commands actions by a third party that would constitute a taking if undertaken directly by the government. See, e.g., Hendler v. United States, 952 F.2d 1364 (Fed. Cir. 1991); Turney v. United States, 126 Ct. Cl. 202, 115 F.Supp. 457 (1953); see also Aerolineas Argentinas v. United States, 77 F.3d 1564 (Fed. Cir. 1996). "[A] compensable taking does not occur unless the government's actions on the intermediate third party have a 'direct and substantial' impact on the plaintiff asserting the takings claim." Casa de Cambio Comdiv S.A., de C.V. v. United States, 291 F.3d 1356, 1361 (Fed. Cir. 2002). At the same time, we have held that there is no potential taking when the government is alleged to have had only mere awareness of the actions of the third party, see, e.g., Shewfelt v. United States, 104 F.3d 1333, 1337 (Fed. Cir. 1997); or the government is alleged to have only engaged in "friendly persuasion" with respect to that activity, see, e.g., Langenegger v. United States, 756 F.2d 1565, 1572 (Fed. Cir. 1985); or the third party has exercised its own discretion, see, e.g., Erosion Victims of Lake Superior Regulation v. United States, 833 F.2d 297, 300-01 (Fed. Cir. 1987).

To be sure, not every requirement by the United States that a third party take action that adversely affects the economic interests of another entity implicates the Takings Clause, or requires that the private party actions be treated as equivalent to

government action. But where, as here, the government command to a third party results in the transfer of alleged private property to the United States, we think that the United States must bear responsibility if a direct government appropriation would itself constitute a compensable taking. Under Texas State's theory of the case, the alleged taking was accomplished by the Federal Reserve in compliance with the command of Treasury and Congress. It alleged that Treasury compelled the transfer of Texas State's property to the United States.[8] We thus hold that there is no jurisdictional bar to this takings claim against the United States.

III

That is not the end of the matter. Although the Court of Federal Claims erred in dismissing the suit for lack of jurisdiction, we conclude that we may appropriately address the merits.

The relevant facts are not in dispute. Texas State does not assert a taking with respect to the requirement that it maintain sterile reserves with the Federal Reserve. This case turns solely on the purely legal question of whether Texas State owned a compensable property interest in the earnings generated by the Federal Reserve through investment of its reserves. See, e.g., Webb's, 449 U.S. at 161; Cermak v. Babbitt, 234 F.3d 1356, 1361 (Fed. Cir. 2000) (holding that the nature of property interests is a question of law); Coast Indian Cmty. v. United States, 550 F.2d 639, 649

---

[8] The government appears to dispute that this transfer was compelled in the non-statutory years but for the purposes of considering this appeal, we accept the plaintiff's well-pled allegations as true. Leider v. United States, 301 F.3d 1290, 1292 (Fed. Cir. 2002).

04-5126                              12

(Ct. Cl. 1977) (determination of plaintiffs' ownership of a compensable property interest was a question of law).

The merits of the takings claim were fully briefed twice in the Court of Federal Claims. The legal question of whether Texas State had a property interest in the earnings of the Federal Reserve was addressed at oral argument in this court, and the parties had yet another opportunity to present supplemental briefing on this issue after oral argument. In their supplemental briefing, neither party objected to our considering the merits. We conclude that it is appropriate to address the merits, and we conclude that Texas State had no property interest in the income generated by the Federal Reserve through its open market operations, and that the complaint should be dismissed for failure to state a claim. See, e.g., Helvering v. Gowran, 302 U.S. 238, 245 (1937).

"It is axiomatic that only persons with a valid property interest at the time of the taking are entitled to compensation." Chancellor Manor v. United States, 331 F.3d 891, 901 (Fed. Cir. 2003). Indeed, we have previously observed that plaintiffs must identify a property interest cognizable under the Fifth Amendment as a "bedrock requirement" of any successful takings challenge. Leider, 301 F.3d at 1295 (citing Wyatt v. United States, 271 F.3d 1090, 1097 (Fed. Cir. 2001)). Here, Texas State has failed to assert a valid property interest.

Texas State argues that its property interest in the share of the net earnings of the Federal Reserve that was generated by the reserve deposits is indistinguishable from the property interests that owners of principal deposited in interest-bearing

accounts claim to the interest earned in those accounts, and that decisions by the Supreme Court have held constitutional "property". App. Supp'l Br. at 7-8.

The "interest follows principal" cases relied upon by Texas State all involved situations where third parties held plaintiffs' funds in separate interest-bearing accounts. Webb's, 449 U.S. at 157-61; Phillips, 524 U.S. at 164; Brown, 538 U.S. at 235. In Webb's, a company filed a complaint of interpleader in state court against Webb and Webb's creditors, and tendered the disputed amount to the court. 449 U.S. at 156-57. The court deducted the statutorily prescribed fee for maintenance of the fund and deposited the remainder in an "assignable interest-bearing account at the highest interest" in a bank. Id. at 157. The Florida court ultimately ordered that the principal be paid to the claimants, but retained more than $100,000 interest earned on the principal. Id. at 157-158. The Supreme Court found that the court appropriation of the interest earned on the interpleader fund, in excess of a fee for services, resulted in a taking. 449 U.S. at 160-61, 164-65. The Court applied the "usual and general rule . . . that any interest on an interpleaded and deposited fund follows the principal and is to be allocated to those who are ultimately to be the owners of the principal," and held that the county's taking of the earned interest implicated the Takings Clause. Id. at 162, 165.

In Phillips v. Washington Legal Foundation, the Court addressed the question of whether interest earned on clients' funds held in IOLTA accounts in private banks constituted private property for purposes of the Takings Clause. 524 U.S. 156. Texas, like other states, required that lawyers holding nominal amounts of client funds, that would otherwise be unable to earn interest, place such funds in a separate, interest-bearing Negotiable Order of Withdrawal (NOW) bank account (an IOLTA account). Id.

"All agree[d] that under Texas law the principal held in IOLTA trust accounts [was] the 'private property' of the client." Id. at 164. The Court applied the "interest follows principal" rule set forth in Webb's and held that that the interest earned on client funds held in IOLTA accounts was the private property of the client for Takings Clause purposes. Id. at 160. The Supreme Court further clarified in Brown v. Legal Foundation of Washington that a per se taking occurred when the state then withdrew this interest and used it to pay for legal services for the indigent. Id. at 235. However, in that case no "just compensation" was due to the clients as a result of this taking, because "without IOLTA those funds would not have produced any net interest," id. at 230, and the value of compensation owed "must be measured by [the Plaintiff's] net losses rather than the public's gain," id. at 237. All of the additional cases relied upon by Texas State in its Supplemental Brief similarly involve claims to interest that was actually generated by specific funds according to the terms of the investment in question.[9]

In contrast to Webb's, Phillips, and Brown, where the deposited funds were held by third party banks, here Texas State did not provide funds to a third party that were then deposited in an interest-bearing account in a private bank, but entered into a direct depositor relationship with the Federal Reserve. Under normal principals of banking law, "the relationship between a bank and its depositor is that of debtor and creditor." Michie on Banks and Banking, ch. IX, § 1 (1994). As the Supreme Court put it almost a century ago, when a bank receives deposits, the funds "belong to the bank, become part of its general funds, and can be loaned by it as other moneys. . . . The general

---

[9] See, e.g., Schneider v. Cal. Dep't of Corr., 151 F.3d 1194 (9th Cir. 1998); Hampton v. Hobbs, 106 F.3d 1281 (6th Cir. 1997); Gillihan v. Schillinger, 872 F.2d 935

doctrine that upon a deposit made by a customer, . . . the title to the money . . . is immediately vested in, and becomes the property of, the bank, is not open to question." Burton v. United States, 196 U.S. 283, 301-02 (1905) (internal quotations omitted); see also City of Douglas v. Fed. Reserve Bank of Dallas, 271 U.S. 489, 492-94 (1926). A debtor/creditor relationship also existed with respect to the amounts paid to receive the Federal Reserve notes held as vault cash. Texas State conceded during oral argument that "there is no private account to which interest was credited."[10] Texas State fails to recognize that its reserve deposits, which by their own terms did not generate income, were fundamentally different from the interest-bearing accounts at issue in Webb's, Brown, and Phillips. And, contrary to Texas State's argument, the mere fact that Texas State was compelled to maintain the reserves on deposit by law—a requirement that is itself not challenged here—did not transform the nature of their underlying property rights. Under such circumstances, even if the funds received by the Federal Reserve were used to earn interest, Texas State did not acquire a property interest in the earnings.

Our court considered this very question in United States Shoe Corporation v. United States. 296 F.3d 1378 (Fed. Cir. 2002). There, exporters paid a harbor maintenance tax that was subsequently found to be unconstitutional. The tax payments were refunded, but the exporters also claimed entitlement to interest on the refunded tax under the Takings Clause. Id. at 1384. The exporter's takings claim alleged that the

---

(10th Cir. 1989); Morton Grove Park Dist. v. Am. Nat'l Bank & Trust Co., 399 N.E. 2d 1295 (Ill. 1980); Bordy v. Smith, 34 N.W.2d 331 (Neb. 1948).
    [10]    The colloquy at oral argument proceeded as follows:
    Question:    But there is no private account to which interest was credited?
    Answer:    I agree. It's all in one big pot.

04-5126                                    16

"government's retention of the interest income earned on the tax revenue [was] a continuing taking." Id. We noted that the "tax revenue . . . became the property of the Treasury upon payment [and] [a]ccordingly, the interest earned on the tax payments is also the property of the government." Id. We rejected the exporter's takings claim, and held that "for the accrued interest to rise to the level of private property, the principal must be held in an identified private account," for example, by a third party bank. Id. Under our decision in United States Shoe, Texas State had no property right to any earnings generated through the Federal Reserve's investment of its required reserves.

We again addressed this issue in Leider v. United States, 301 F.3d at 1290. In that case, the bankruptcy court issued a check to Leider, an unsecured creditor. Id. at 1293. Due to a change of address, Leider did not receive the check. Id. As required by statute, after Leider's check remained uncashed for 90 days, the unclaimed funds were transferred to the bankruptcy court for deposit with the United States Treasury, pending the filing of a petition claiming his distributive share. Id. Approximately two years later, Leider filed a petition and received Leider's share of the bankruptcy estate, without interest. Id. He subsequently filed a suit in the Court of Federal Claims, alleging "that the government's failure to pay interest on his distributive share of the unclaimed bankruptcy funds constituted a taking of property under the Fifth Amendment." Id. We found that, in contrast to the situations in Webb's and Phillips, "because there existed no interest, there was nothing that could be taken." Id. at 1297. "This accords with the traditional immunity of the Government from the burden of interest unless it is specifically agreed upon by contract or imposed by legislation." United States v. Goltra, 312 U.S. 203, 207 (1941).

04-5126                                    17

So here, no deposit was made with a third party, such as a private bank, that resulted in earned interest. The mere fact that the Federal Reserve owed a debt to Texas State did not entitle Texas State to an imputed return on those funds or to a share of earnings of the Federal Reserve.

Texas State has failed to state a claim for which relief can be granted, as it had no property interest, cognizable under the Fifth Amendment, in the earnings generated by the Federal Reserve through its investment of required reserves. Texas State's lack of a property interest in the earnings generated by its mandated reserves is fatal not only to its takings claim, but also to its illegal exaction and due process claims. There can be no illegal exaction or due process violation if the money exacted was never the property of Texas State.

## CONCLUSION

For the foregoing reasons, we affirm the Court of Federal Claim's dismissal of this action.

<u>AFFIRMED</u>

COSTS

No costs.

# United States Court of Appeals for the Federal Circuit

04-5126

TEXAS STATE BANK,
(successor by merger to COMMUNITY BANK & TRUST),

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

NEWMAN, Circuit Judge, concurring in part, dissenting in part.

I agree that the United States is the appropriator of the funds for which Texas State Bank claims compensation; thus it is irrelevant whether the Federal Reserve System is or is not a Non-Appropriated Funds Instrumentality (NAFI), for the requirement that the earnings on Texas State Bank's deposits with the Federal Reserve Banks must be paid over to the United States Treasury is an action of the United States. Thus I concur in the court's holding that the United States was properly before the Court of Federal Claims, and that the case was improperly dismissed on NAFI grounds.

The case should now be remanded to the Court of Federal Claims for determination of the substantive question. I respectfully dissent from the panel majority's undertaking, sua sponte and at the behest of neither party, to decide the complex questions raised by

the appropriation by the United States of the earnings on the banks' Reserve deposits. This issue was not decided by the Court of Federal Claims, and no decision of the merits is presented for appellate review. It is as unfair to the parties as it is irregular for this court to reach out and decide this complex question upon the limited post-argument briefing we requested. This appeal was taken solely on the jurisdictional NAFI question and, having decided that question, the merits require adjudication by the Court of Federal Claims.

I

Since the substantive issue is nonetheless being decided by my colleagues, I must dissent from the panel majority's misapplication of law and its unsupported conclusion. It is beyond debate that money is property, and that the earnings on that money are property. In Webb's Fabulous Pharmacies, Inc. v. Beckwith, 449 U.S. 155 (1980) the Court stated:

> The earnings of a fund are the incidents of ownership of the fund itself and are property just as the fund itself is property.

449 U.S. at 164. Again in Phillips v. Washington Legal Foundation, 524 U.S. 156, 160 (1998) the Court implemented this property right:

> The question presented by this case is whether interest earned on client funds held in [Interest on Lawyers Trust Accounts] is "private property" of either the client or the attorney for purposes of the Takings Clause of the Fifth Amendment. We hold that it is the property of the client.

Again in Brown v. Legal Foundation of Washington, 538 U.S. 216, 235 (2003) the Court held that the interest earned on deposits of clients' funds is the property of the client, not of

04-5126                                                    2

the state. Although the Court recognized that when no interest was earned none had to be paid, it is undisputed that substantial interest is here earned.[1]

Principal and interest are property. The post-argument brief filed by Texas Bank contained expert testimony explaining that placement of a specified percentage of banks' funds in Reserve is compulsory, that minimum deposits must be met or a penalty paid, that the banks own their Reserve deposits, and can withdraw them and trade them in the "Fed funds market." Indeed, it is not disputed that the banks own their reserve deposits. They also own the interest earned by those deposits. "The rule that 'interest follows principal' has been established under English common law since at least the mid-1700's." Phillips, 524 U.S. at 165. The Court in Phillips cited representative cases from the various states, holding that the interest is the property of the owner of the principal:

> *E.g., Freeman v. Young,* 507 So.2d 109, 110 (Ala.Civ.App. 1987) ("The earnings of a fund are incidents of ownership of the fund itself and are property just as the fund itself is property" (internal quotation marks omitted)); *Pomona City School Dist. v. Payne,* 9 Cal.App.2d 510, 512, 50 P.2d 822, 823 (1935) ("[O]bviously the interest accretions belong to such owner"); *Vidal Realtors of Westport, Inc. v. Harry Bennett & Assocs., Inc.,* 1 Conn.App. 291, 297-298, 471 A.2d 658, 662 (1984) ("As long as the attached fund is used for profit, the profit . . . is impounded for the benefit of the attaching creditor and is subject to the same ultimate disposition as the principal of which it is the incident" (internal quotation marks omitted)); *Burnett v. Brito,* 478 So.2d 845, 849 (Fla.App. 1985) ("[A]ny interest earned on interpleaded and deposited funds follows the principal and shall be allocated to whomever is found entitled to the principal"); *Morton Grove Park Dist. v. American Nat. Bank & Trust Co.,* 78 Ill.2d 353, 362-363, 35 Ill.Dec. 767, 771, 399 N.E.2d 1295, 1299 (1980) ("The earnings on the funds deposited are a mere incident of ownership of the fund itself"); *B&M Coal Corp. v. United Mine Workers,* 501 N.E.2d 401, 405 (Ind. 1986) ("[I]nterest earnings must follow the principal and be distributed to the ultimate owners of the fund"); *Unified School Dist. No.*

---

[1] In fiscal year 2000 the Federal Reserve was required to transfer net earnings of $3,752 billion to the General fund of the Treasury. App. Br. at 16, U.S. Supplemental Br. at 3.

*490, Butler County v. Board of County Commissioners of Butler County,* 237 Kan. 6, 9, 697 P.2d 64, 69 (1985) ("[I]nterest follows principal"); *Pontiac School Dist. v. City of Pontiac*, 294 Mich. 708, 715-716, 294 N.W. 141, 144 (1940) ("The generally understood and applied principles that interest is merely an incident of the principal and must be accounted for"); *State Highway Comm'n v. Spainhower,* 504 S.W.2d 121, 126 (Mo. 1973) ("Interest earned by a deposit of special funds is an increment accruing thereto" (internal quotation marks omitted)); *Siroky v. Richland County,* 271 Mont. 67, 74, 894 P.2d 309, 313 (1995) ("[I]nterest earned belongs to the owner of the funds that generated the interest") . . . .

The Court's extensive list drums into consciousness the universality of the rule that interest on deposited funds belongs to the owner of the deposited funds. Phillips, 524 U.S. at 165 n.5. No exception has been noted.

Law and precedent leave no doubt that earnings on deposited money are the property of the depositor, not of the custodian and not of the state. If this court is to create a unique exception for bank deposits with the Federal Reserve, more support is required than the panel majority's theory that because the deposits are not labeled "interest-bearing" and the earnings are placed "in one big pot" in the Federal Reserve banks, see maj. op. n.10, the interest is not the property of the depositor.

Indeed, the government does not take the position that the United States owns either the deposits in Reverse banks (or the vault cash) or the interest thereon; the government's position is that the Federal Reserve owns the interest because the accounts are designated as non-interest-bearing, and thus that when Texas State Bank made the required deposits in a non-interest-bearing account, it yielded all right to the interest earned by those deposits. That accounting argument does not support the appropriation of billions of dollars of bank depositors' property.

The United States describes its diversion of the Reserve earnings to the general

04-5126                                    4

Treasury as "a tax upon the Federal Reserve System." U.S. Supplemental Br. at 3 n.3. Texas State Bank observes that such a "tax" is not on the Federal Reserve System, but on all persons who place their money in banks and, absent taxing authority, raises Fifth Amendment concerns. Indeed, in some years the diversion of the Reserve income was by act of Congress, and in some years only by Treasury demand. The entire case is rife with unexplored legal, economic, and policy considerations, and the stakes are high. The ultimately correct answer to all the questions awaits resolution, for the court's decision today is as unsupported as it is premature. It demands the considered judgment, in the first instance, by the Court of Federal Claims.[2]

## II

The panel majority, justifying its treatment of this unappealed issue, states that it is simply affirming the trial court's decision on an alternative ground. However, the trial court did not decide the issue, on any ground. Only the threshold NAFI question was decided, and only the NAFI question is before us.

---

[2] The majority opinion suggests that the parties "did not object" to our "considering" the merits. The parties were never told that we were going to decide the merits. Indeed, the scope of the supplemental briefing that the panel requested was not commensurate with the merits.