# United States Court of Appeals for the Federal Circuit

---

**GREAT NORTHERN PROPERTIES, L.P.,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2022-2086

---

Appeal from the United States Court of Federal Claims in No. 1:21-cv-02148-EJD, Senior Judge Edward J. Damich.

---

Decided: February 15, 2024

---

CHAD E. ADAMS, Browning, Kaleczyc, Berry & Hoven, PC, Helena, MT, argued for plaintiff-appellant. Also represented by STEVEN WADE.

AMBER BETH BLAHA, Appellate Section, Environment and Natural Resources Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by DANIEL HALAINEN, TODD KIM.

---

Before MOORE, *Chief Judge*, DYK and STOLL, *Circuit Judges*.

DYK, *Circuit Judge.*

Great Northern Properties, L.P. ("GNP") brought suit against the United States, alleging a Fifth Amendment taking of its coal leases on the Otter Creek property in Montana. GNP contended that the federal government acted through the Montana state regulatory authority to preclude the necessary permits. GNP's theory was that either Montana's actions were coerced by the federal government or that Montana acted as an agent of the federal government. The Court of Federal Claims ("Claims Court") dismissed for lack of subject matter jurisdiction. In the alternative, the Claims Court dismissed for failure to state a claim upon which relief could be granted. We agree that the Claims Court properly dismissed for lack of subject matter jurisdiction. GNP did not establish that Montana's actions were coerced, or that Montana acted as an agent of the federal government. We affirm.

BACKGROUND

I

Coal mining in Montana has long been subject to state and federal regulation. Since 1973, Montana has required operators to obtain permits before engaging in strip mining. MONT. CODE ANN. § 82-3-104 (1973) (repealed 1979). Montana's 1973 statute provided that "[n]o operator may engage in strip mining without first obtaining approval of a strip-mining plan from the department." *Id.* The law "recogniz[ed] the importance of natural resources to the welfare of present and future generations of the people of Montana." *Id.* § 82-3-102.

In 1977, Congress enacted the Surface Mining Control and Reclamation Act ("SMCRA"). 30 U.S.C. § 1201. The Act was designed to "establish a nationwide program to protect society and the environment from the adverse effects of surface coal mining operations," and "assure that surface coal mining operations are so conducted as to

protect the environment." 30 U.S.C. § 1202(a), (d). Under this law, states can become "primacy" states by enacting their own state law, which allows them to "assume exclusive jurisdiction over the regulation of surface coal mining and reclamation operations," 30 U.S.C. § 1253(a). But the state law must comply with minimum federal standards. *Id.* Alternatively, states can elect not to regulate—in which case the federal government will regulate instead, applying federal standards directly. 30 U.S.C. § 1254(a).

Following the enactment of SMCRA, Montana decided to repeal its existing statute and enact its own state statute complying with federal standards. *See* 45 Fed. Reg. 21,560 (Apr. 1, 1980) (codified at 30 C.F.R. pt. 926.10) ("On August 3, 1979, the State of Montana submitted to the Department of the Interior its proposed permanent regulatory program under . . . [SMCRA]."). The 1979 enactment replaced the existing 1973 state statute with The Montana Strip and Underground Mine Reclamation Act ("MSUMRA"), MONT. CODE ANN. §§ 82-4-201–82-4-255 (1979). The permitting requirements in the new law were made more specific to conform with the federal statute, including requiring the state agency "to prohibit mining which would destroy the essential hydrologic functions of alluvial valley floors [(AVF)]," and requiring a "more detailed analysis of the hydrologic effects of mining" for the purposes of deciding whether a permit should be granted. *Hearing on S.B. 515 Before the S. Comm. on Nat. Res.*, 46 Leg. Sess., at 2 (Mont. 1979).

The legislative history of the amended Montana law shows no objection to the federally mandated provisions. Legislators noted that "Montana's [prior] act is for the most part as stringent as the federal act" and that "many federal provisions were taken from [Montana's] act." *Id.* The Montana Department of Environmental Quality ("MDEQ"), the state regulatory authority, was given the authority to review permit applications and to issue the required mining

permits.  Following federal approval of the state regulatory scheme, Montana was granted "primacy" status in 1982.

## II

Plaintiff GNP has an ownership interest in the Otter Creek coal property in Powder River County, Montana.[1]  In 2009, GNP entered into a coal lease with Arch Coal.  Arch Coal agreed to mine the coal and to pay GNP a 12.5% royalty on every ton of coal.  In 2012, Otter Creek Coal, LLC, a subsidiary of Arch Coal, filed an application for a surface mining coal permit with the MDEQ.  Under Montana's law, before approving a strip or underground coal mining permit, an applicant must show that the proposed operation "would not interrupt, discontinue, or preclude farming on alluvial valley floors," MONT. CODE ANN. § 82-4-227(3)(b)(i) (1979), nor would it "materially damage the quantity or quality of water in surface water or underground water systems that supply [alluvial] valley floors," *id.* § 82-4-227(3)(b)(ii).  In 2017, the MDEQ "determined that an AVF significant to agriculture was present on Tract 2" of the proposed Otter Creek Mine. Compl. ¶ 20.  The MDEQ later determined that, due to the presence of the AVF, the coal reserves underlying the AVF "cannot be considered for mining." Compl. ¶ 21.  In 2020, the MDEQ further determined that additional coal deposits adjacent to Tract 2 of the Otter Creek Mine were also precluded from mining by the presence of an AVF.  Compl. ¶ 22.

GNP alleges that the fair market value of the coal interests, if not precluded by the MDEQ AVF determination, would be at least $1,310,872,932.00, but the denial of the permit has deprived GNP of all economically viable use of its interest in the coal property.

---

[1]    The State of Montana also owns a share of the property.  Montana's ownership interest is not relevant to the takings issue.

### III

In 2021, GNP brought suit against the United States in the Claims Court seeking compensation for an alleged Fifth Amendment taking. Under *A & D Auto Sales v. United States*, a showing that the federal government's influence over the MDEQ was "coercive rather than merely persuasive" or that the MDEQ was "acting as the [federal] government's agent" is required to hold the federal government responsible for the MDEQ's actions. 748 F.3d 1142, 1154 (Fed. Cir. 2014). GNP's contention was that the taking was properly attributed to the federal government under both theories. The implementation of the AVF standards in Montana was alleged to be coercive because "Montana had no option but to have such regulation implemented within its state borders" and to deny the permits and that the MDEQ was acting as an agent of the federal government in deciding not to issue the mining permits. Appellant Br. 15–16.

The Claims Court dismissed the case for lack of subject matter jurisdiction. It concluded that there was no federal coercion nor was Montana acting as an agent of the federal government. The Claims Court alternatively dismissed for failure to state a claim, relying on much the same reasoning, and also on the theory that the takings claims would have been barred because of state nuisance law (there being no categorical taking) and because the regulatory takings claims failed under the *Penn Central* test. *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978).

GNP timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

### DISCUSSION

We review the Claims Court's decision to dismiss a claim for lack of subject matter jurisdiction de novo. *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011). Under the Tucker Act, the Claims

Court only has jurisdiction over claims "against the United States."  28 U.S.C. § 1491(a)(1).

GNP alleges that its injuries result from the two decisions of the MDEQ that effectively denied the permits necessary for mining.  The claim is not that a taking of the Otter Creek property occurred when the federal statute, SMCRA, was enacted or when the federal regulations were adopted.[2]  The theory instead is that a taking occurred when Montana implemented the federal program by denying the requested permits.

## I. Alleged Federal Coercion

GNP first contends that the federal government is responsible for the permit denial because Montana was coerced to enact its own regulatory program following the passage of SMCRA.  Coercion by the federal government of state or private authority can create federal liability for a taking.  *See A & D Auto Sales*, 748 F.3d at 1154; *see also Tex. State Bank v. United States*, 423 F.3d 1370, 1377 (Fed. Cir. 2005) ("[W]here, as here, the government command to a third party results in the transfer of alleged private property to the United States, we think that the United States must bear responsibility . . . ."); *Turney v. United States*, 126 Ct. Cl. 202, 214 (1953).  In *A & D Auto Sales*, terminated GM and Chrysler dealers alleged that the federal government had effected a regulatory taking of their dealer franchises by "coerc[ing]" the automakers to terminate the dealers as a condition of federal financial assistance that

---

[2]   "GNP further clarifies that the mere enactment of SMCRA did not affect a taking . . . ."  *Great N. Props., L.P. v. United States,* No. 21-2148, 2022 WL 2903359, at \*5 (Fed. Cl. July 22, 2022).  Indeed, in *Hodel v. Indiana*, the Supreme Court held that SMCRA did not effect an unconstitutional taking of private property by its "mere enactment."  452 U.S. 314, 334–35 (1981).

"the automakers could not survive without." 748 F.3d at 1154. On the basis of the record at that stage of the proceeding, we declined to find whether coercion existed, noting that "[t]he line between coercion (which may create takings liability) and persuasion (which does not create takings liability) is highly fact-specific and hardly simple to determine." *Id.*[3]

Plaintiff does not allege that Montana would have suffered any ill effects if it had decided to not enact its own state statute. The federal statute simply provided that if a state did not enact its own state law, a separate federal regulatory scheme would be applicable.

As noted, the legislative history of MSURMA, the 1979 state law that repealed Montana's prior mining regulation to bring Montana state law in conformity with SMCRA, shows no objection to the federal statute, recognizing that the federal law was modeled on Montana's own statute. *Hearing on S.B. 515 Before the S. Comm. on Nat. Res.*, 46 Leg. Sess., at 2 (Mont. 1979). The legislative history further explained that a "federally-run program" would not be in the best interests of Montana because it would mean

---

[3] After our remand, the Claims Court determined that the government's action did not amount to coercion and that the plaintiffs failed to establish that "their franchise agreements would have had value in a 'but for world' without government assistance." *Colonial Chevrolet Co., Inc. v. United States*, 145 Fed. Cl. 243, 322 (2019). On further appeal, we held that the Claims Court "committed no reversible error in determining that the dealers failed to prove a positive value that their franchise agreements would have had but for the challenged government actions." *Taylor & Sons, Inc. v. United States*, 841 F. App'x 205, 208 (Fed. Cir. 2020) (non-precedential). Because that conclusion was sufficient to affirm the Claims Court, we did not reach the issue of coercion. *Id.*

"less effective reclamation, less efficient use of tax dollars, and no state input into the program." *Id.* These are not the type of considerations that rise to the level of coercion.

In any event, federal law does not dictate the result in individual permitting cases. State law governed the permitting process,[4] and while Montana's own regulatory program, according to GNP, did not go beyond the federal requirements, there are differences between SMCRA and the Montana state law. For example, Montana focused its mining program on "circumstances unique to Montana." 45 Fed. Reg. 21,560, 21,563. And, as discussed below, the state makes individual permitting decisions tailored to the facts of individual cases without federal input.

The Supreme Court's decisions upholding the constitutionality of SMCRA confirm that state regulatory programs were not coerced by the federal government. In a pre-enforcement challenge to the statute, when discussing the

---

[4] *See, e.g., Mont. Env't Info. Ctr. v. Westmoreland Rosebud Mining, LLC*, 2023 WL 8103553, ___ P.3d ___ (Mont. 2023) (Montana state court considering an appeal of an MDEQ permitting decision); *see also Bragg v. W. Va. Coal Ass'n*, 248 F.3d 275, 289 (4th Cir. 2001) (discussing SMCRA and its implementation in West Virginia, which granted "West Virginia 'primacy' status," the court held that "because the regulation is mutually exclusive, either federal law or State law regulates coal mining activity in a State, but not both simultaneously. Thus, after a State enacts statutes and regulations that are approved by the Secretary, these statutes and regulations become operative, and the federal law and regulations . . . 'drop out' as operative provisions."); *Haydo v. Amerikohl Min., Inc.*, 830 F.2d 494, 497–98 (3d Cir. 1987) ("In order to allow the individual states to retain this primary responsibility, the statute provided for state jurisdiction over its own operators to be exclusive once the state plan has been approved.").

constitutionality of the "steep-slope" provision of the Act, the Court noted that "the States are not compelled to enforce the steep-slope standards, to expend any state funds, or to participate in the federal regulatory program in any manner whatsoever." *Hodel v. Va. Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264, 288 (1981). In fact, the Court held that:

> [T]here can be no suggestion that the Act commandeers the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program. The most that can be said is that the Surface Mining Act establishes a program of cooperative federalism that allows the States . . . to enact and administer their own regulatory programs.

*Id.* at 288–89 (internal citations omitted).

So too in other cases, the Supreme Court has held that the enactment of an overall federal framework does not coerce a particular result in individual cases. For example, in *Griggs v. Allegheny County*, Allegheny County owned and maintained the Greater Pittsburgh Airport. 369 U.S. 84, 85 (1962). A takings claim was asserted against the county on the theory that the state authorization of low flying flights over the claimant's home had taken an air easement over the property. *Id.* at 87. The county defended on the theory that the federal government, not the county, was liable for the taking. *Id.* at 89. The airport was designed "in conformity with the rules and regulations of the Civil Aeronautics Administration [('C.A.A.')] within the scope of the National Airport Plan provided for in 49 U.S.C. § 1101." *Id.* at 85. Allegheny County executed agreements with the Administrator of Civil Aeronautics "in which it agreed . . . to abide by and adhere to the Rules and Regulations of [the] C.A.A." *Id.* at 86. The Supreme Court held that the fact-specific decisions of the "promoter, owner, and lessor of the airport" created the consequences which

constituted the taking. *Id.* at 89. Allegheny County "decided . . . where the airport would be built, what runways it would need, their direction and length, and what . . . navigation easements would be needed." *Id.* Despite the extensive federal regulation and approval of the county's plan, "[t]he Federal Government [took] nothing." *Id.* The actions of Allegheny County were of the county alone, even where there was federal regulation and a federal statutory framework.

To be sure, this court held that the SMCRA's enactment was a taking in the unusual circumstance where the statute on its face was designed to reach a certain property specifically. *Whitney Benefits, Inc v. United States*, 926 F.2d 1169, 1170 (Fed. Cir. 1991) ("A key element in this case is that SMCRA expressly precluded a permit for surface mining an AVF described in the statute in terms precisely applicable to, and known to be applicable to, the AVF overlying the Whitney coal property."). GNP suggests that the facts here are analogous to those considered in *Whitney Benefits*. Oral Argument 1:17–1:38. But there is no evidence here that Congress designed the statute to reach the Otter Creek property specifically—or that Congress was even aware of the existence of the Otter Creek property when it enacted the law in 1977. The Claims Court correctly held that GNP had not established federal coercion.

## II. Allegation that the MDEQ is an Agent of the Federal Government

GNP alternatively alleges that the existence of federal standards created an agency relationship between the federal government and Montana. Appellant Br. 11, 15. To create an agency relationship, a principal must "manifest[] assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control." RESTATEMENT (THIRD) OF AGENCY § 1.01 (2006); *see also Hollingsworth v. Perry*, 570 U.S. 693, 713 (2013) (noting that "[a]n essential element of agency is the

principal's right to control the agent's actions") (quoting RESTATEMENT (THIRD) OF AGENCY § 1.01, Comment *f* (2006)). GNP alleges that the federal government maintained sufficient control over Montana because of its required federal approval of the overall Montana program. In similar circumstances, our court has found a lack of agency relationship. *B&G Enters., Ltd. v. United States*, 220 F.3d 1318, 1325 (Fed. Cir. 2000).

*B&G Enterprises* concerned a regulatory takings claim, where B&G alleged that the United States was liable for a taking of B&G's property rights in tobacco vending machine contracts when it provided grant funding for states that enacted regulations restricting vending machine sales, and California enacted such a statute. *Id.* at 1322. We held that California was not acting as an agent of the United States when it enacted its own state law. *Id.* at 1323–25. Because California "is an independent sovereign, which itself possess the authority to enact legislation," *id.* at 1324, passing its own state law, pursuant to its authority to do so as an independent sovereign, did not make the state an agent of the federal government. The Claims Court similarly and correctly found that GNP failed to establish an agency relationship.

GNP has failed to allege facts that would establish that the federal government exercised day-to-day control over the fact-based determinations of the MDEQ. Some cases have found agency based on the existence of control when a party acts pursuant to a federal order. *See Preseault v. United States,* 100 F.3d 1525, 1550–51 (Fed. Cir. 1996) (en banc); *Hendler v. United States,* 952 F.2d 1364, 1378–79 (Fed. Cir. 1991). But there is no contention that the MDEQ was acting pursuant to a federal order, and GNP admits that there was no federal order in place. *Great N. Props.,* No. 21-2148, 2022 WL 2903359, at *4 ("GNP acknowledges that 'the State of Montana was not acting pursuant to a federal agency order in making its AVF determination.'").

GNP points to the SMCRA's "Inadequate State Enforcement" provision "as a clear example of the control retained by the United States." Appellant Br. 18 (citing 30 U.S.C. § 1271(b)). Under the Act, the Department of the Interior can intervene in a state regulatory program if there is a failure of a state program to follow federal requirements, but there is no provision for advance federal agency review of individual decisions of the Montana state agency or other state agencies for compliance. Section 1271(a)(1) provides that, if "the Secretary has reason to believe that any person is in violation of any requirement of this chapter or any permit condition required by this chapter, the Secretary shall notify the State regulatory authority." If "the State regulatory authority fails within ten days after notification to take appropriate action," the federal government will begin a federal inspection. 30 U.S.C. § 1271(a)(1). If the Secretary determines that state enforcement is inadequate, "the Secretary shall enforce, in the manner provided by this chapter, any permit condition required under this chapter, shall issue new or revised permits in accordance with requirements of this chapter, and may issue such notices and orders as are necessary for compliance therewith." *Id.* § 1271(b). But this is not a situation where each permitting decision is individually reviewed or controlled by the federal government prior to issuance. Nor is it a situation in which the Montana permitting process was found to be inadequate, leading to federal intervention. Indeed, there is no evidence that the MDEQ decision here regarding the Otter Creek coal property was even reviewed by the federal Department of the Interior.

As described by the Third Circuit in the context of an issue of sovereign immunity, this regulatory scheme is one where the federal law "is geared to the initial development of a state program and state law is geared to the administration and regulation under that program. In a nutshell, the Secretary steps back and lets an approved program

run." *Pa. Fed'n of Sportsmen's Clubs, Inc. v. Hess*, 297 F.3d 310, 317 (3d Cir. 2002). Far from controlling each individual decision of a state agency, the federal government, by its own statutory design, intends to "step[] back and let[] an approved program run." *Id.* Under these authorities, there is no basis for finding federal control of permitting decisions or to find that Montana was acting as an agent of the federal government.

In short, the federal government provided no input as to whether or not the permits should be issued. There is extensive evidence of the specific, fact-based analysis of the property undertaken by the MDEQ, applying state law. Before issuing a determination on Otter Creek Coal's permit application, the MDEQ "conducted on-the-ground testing, including 'use of maps, field geology and monitoring well and piezometer drill logs.'" Appellee Br. 8; J.A. 30. Additionally, the MDEQ "interviewed the four ranching operators in the area, three in person and one by phone." Appellee Br. 8; J.A. 43. The MDEQ issued these determinations after these fact-intensive surveys of the proposed mining sites, and interviews with nearby ranch owners and examination of geologic and hydrologic criteria. As the Claims Court found, "[M]DEQ's decision—based on the site-specific and individualized assessment of the Otter Creek coal property—is sufficiently discrete and removed from the federal government's action in creating these requirements that there is no direct causation that would expose the government to liability." *Great N. Props.*, No. 21-2148, 2022 WL 2903359, at *6.[5]

---

[5]    GNP also argues that the potential remedy of a federal coal exchange, providing for the exchange of private coal precluded under the Act with federal coal that is not precluded, "implicitly acknowledges that compensation is due from the federal government when application of AVF

CONCLUSION

The Claims Court properly determined that there is a lack of subject matter jurisdiction because GNP has not established that Montana was coerced or that the MDEQ was acting as an agent of the federal government when it precluded mining on the Otter Creek property. The decision of the Claims Court to dismiss is affirmed.

**AFFIRMED**

---

regulations precludes mining of private coal." Appellant Br. 32–33. We do not agree.